# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
_____
ROBERTS TECHNOLOGY GROUP, INC.          :
120 New Britain Boulevard               :
Chalfont, PA  18914                     :
                    Plaintiff           :         CIVIL ACTION
          v.                            :         CASE NO.
CURWOOD, INC.                           :
2200 Badger Avenue                      :
P.O. Box 2968                           :
Oshkosh, WI 54903-2968                  :
                                        :         JURY TRIAL DEMANDED
                    Defendant           :
_____
```

Plaintiff, Roberts Technology Group, Inc. (hereinafter "RTG"), by and through its attorneys, Law Offices of Brian Grady, P.C., hereby files this Complaint against Defendant, Curwood, Inc. (hereinafter "Curwood") and avers as follows:

## THE PARTIES

1.     Plaintiff, Roberts Technology Group, Inc. ("RTG"), is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principle place of business in Chalfont, Pennsylvania.

2.     RTG is informed and believes, and on that basis alleges, that Defendant, Curwood, Inc. ("Curwood"), is a corporation organized and existing under the laws of the State of Delaware with a principle place of business in Oshkosh, Wisconsin.  Curwood is a manufacturer of packaging trays.

## JURISDICTION AND VENUE

3.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

Plaintiff is a Pennsylvania citizen because it is incorporated in the Commonwealth of Pennsylvania and

its principle place of business is located in Pennsylvania.  Defendant is a citizen of the State of

Delaware and the State of Wisconsin because it is incorporated in the State of Delaware and has a

principle place of business in Wisconsin.  The amount in controversy is in excess of $75,000. See 28

U.S.C.§ 1332.

4.     Venue is proper in the Eastern District of Pennsylvania because the facts and

circumstances giving rise to the cause of action occurred in this judicial district and Defendant has

purposely directed its business activities to citizens and residents of the Eastern District of

Pennsylvania.   28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### Agreement between Curwood and RTG

5.     RTG is a packaging machinery supplier and film converter/distributor based in

Chalfont, Pennsylvania.  RTG's product lines include packaging equipment such as overwrappers,

thermoformers, banders, tray sealers and filler sealers.  RTG also sells machinery and packaging films

for use in its packaging equipment.  RTG, however, does not manufacture packaging trays to be used

in tandem with its packaging machinery and packaging films.

6.     In July 2011, RTG and Curwood corresponded regarding establishing a

manufacturer/distributor relationship for Curwood's trays.  Curwood quoted pricing which RTG

informed them would help to secure clients to the exclusion of competitor, Oliver Company.  (See

Exhibit "A").

7.      In or around October 2011, RTG and Curwood entered into an agreement whereby Curwood would supply its trays for use in RTG packaging machines for clients sourced, developed and contracted with by RTG.  (See Exhibit "B").  Curwood agreed that the clients identified in Exhibit "B" would be "protected."  This meant that Curwood would only deal with, communicate with, or sell to, those entities through RTG.

8.      Curwood agreed to supply RTG with its trays. Peter Wright, Curwood's Head of Integrated Sales, informed RTG, however, that before it would "approve" RTG to offer its trays for sale to any potential account, or to make a call on any potential account, RTG would be required to fill out and send to Curwood for approval its "Distributor Lead Form."  (See Exhibit "C").

9.      Curwood's Distributor Lead Form required RTG to provide Curwood with: the business name of the potential account, the physical location of the potential account, the estimated annual sales volume of the account, the packaging machinery equipment used by the potential new account, and the packaging material required to service the new account.

10.      Curwood would review the "Distributor Lead Form" submitted by RTG to determine whether the potential lead, or potential new client that RTG wished to contact, was an already existing "Proprietary Confidential" client or a client that Curwood and/or any other Curwood distributor had already contacted/had a relationship with.  If it was determined by Curwood that the potential new client identified by RTG in its "Distributor Lead Form" was not a "protected" client, Curwood would then approve RTG for that account.[1] (See Exhibit "C").

11.      If Curwood determined that the potential new client identified by RTG in its Distributor Lead Form was a client with whom Curwood had an existing relationship of any kind, they would not approve that "lead" as a "protected" account for RTG. (See Exhibit "D").[2]

---

[1] This process did not disrupt the protection afforded by Curwood to those clients identified in "Exhibit B."
[2] Additionally, Curwood specifically precluded RTG from selling any Oliver products. (See Exhibit D-1) See also D-2 "no machine company".

12.     As per the agreement between the parties, RTG would not pursue these "disapproved" leads.

13.     In exchange for completing and submitting Curwood's Distributor Lead Form and providing Curwood with critical, potential new business information, Curwood agreed to protect RTG on every account it approved RTG to service.

14.     Curwood's account protection provided that RTG would be the only entity permitted to service any account for which RTG had been approved and protected by Curwood.

15.     Curwood's account protection provided that no other entity would be permitted to sell any Curwood product to any account for which RTG had been approved and protected.

16.     Curwood's account protection provided that Curwood itself would never sell its products directly to any account for which RTG had been approved and protected.

17.     Curwood's account protection provided that Curwood would not sell its products to any third party who, in turn, could sell those products to any account for which RTG had been approved and protected.

18.     Curwood 's account protection provided that any inquiries, any contact, any offers to purchase, any pricing information, any questions whatsoever directed to Curwood or any other entity regarding any account that RTG had been approved and protected, would be directed to RTG.

19.     RTG and Curwood agreed to those terms and, in or around July 2011, RTG began submitting Distributor Lead Forms to Curwood for approval.  (See Exhibit "C").


**Curwood Approves and Agrees to Protect RTG on the Meals on Wheels Central Maryland Account**

20.     In or around February 2011, Plaintiff initiated communication with Meals On Wheels Central Maryland in an attempt to secure their business as a protected account with Defendant, Curwood. (See Exhibit "E").

21.     In or around May 2011, Meals On Wheels Central Maryland tested Plaintiff's products in anticipation of engaging Plaintiff's services.  (See Exhibit "F").

22.     On July 18, 2011, RTG provided Curwood with a Distributor Lead Form identifying Meals On Wheels Central Maryland as a potential new client.  (See Exhibit "G").

23.     On July 19, 2011, Curwood, through Peter Wright, informed RTG that it was approved for Meals On Wheels Central Maryland and that this would be a protected account.  (See Exhibit "H").

24.     In or around October 2011, Meals on Wheels Central Maryland purchased machines from Plaintiff to fit Plaintiff's trays.  (See Exhibit "I").

25.     In or around January 2012, RTG and Meals on Wheels Central Maryland entered into a contract, whereby, RTG would provide trays to Meals On Wheels Central Maryland.  (See Exhibit "J").

26.     In or around January 2013, Meals On Wheels Central Maryland opted to not renew their contract with RTG, because Meals On Wheels Central Maryland was offered a cheaper price for the trays by Valley Services, who received trays from Oliver Company, who received trays from Curwood, in violation of Curwood's contract with, and protection of RTG .  (See Exhibit "K").

27.     Upon information and belief, Curwood is selling trays directly to Meals On Wheels of Central Maryland and/or is selling trays to third parties who are selling Curwood trays to Meals On Wheels of Central Maryland in violation of RTG's agreement/contract with Curwood.


**Curwood Approves and Agrees to Protect RTG on the ARAMARK/Phila Dept. of Corrections Account**

28.     On July 19, 2011, RTG provided Curwood with a Distributor Lead Form identifying Aramark/Philadelphia Department of Corrections as a potential new client. (See Exhibit "L").

29.     On July 19, 2011, Curwood informed RTG that it was approved for the Aramark/Philadelphia Department of Correction's account and that "the account is now on a protected

list . . .."  Curwood further stated that "[a]ll contact to the customer will be directed thru [sic] your company."  (See Exhibit "M").

30. RTG serviced the account with Aramark/Philadelphia Department of Corrections for 30 months.

31. RTG's contract with Aramark/Philadelphia Department of Corrections accounted for $18,000 per week/$83,592 per month/$1,003,104 per year.  This contract was expected, per conversation with Aramark, to last a minimum of five (5) years.

32. Upon information and belief, Curwood is selling trays to Aramark/Philadelphia Department of Corrections directly and/or selling trays to third parties who are selling Curwood trays to Aramark/Philadelphia Department of Corrections in violation of RTG's contract with Curwood.

### Curwood Approves and Agrees to Protect RTG on the Meals on Wheels  Northampton Account

33. On July 18, 2011, RTG provided Curwood with a Distributor Lead Form identifying Meals on Wheels Northampton as a potential new client. (See Exhibit "N").

34. On July 18, 2011, Curwood informed RTG that it was approved for the Meals on Wheels Northampton account and that "the account is now on a protected list. . . ."  Curwood further stated that "[a]ll contact to the customer will be directed thru your company."   (See Exhibit "O").

35. Between July 2011 and April 29, 2013, Plaintiff and Meals On Wheels Northampton enjoyed a fruitful relationship approved and protected by Defendant.  (See Exhibit "P").

36. During the course of the relationship between Plaintiff and Meals On Wheels Northampton, Meals on Wheels Northampton memorialized their praise of RTG in writing.  (See Exhibit "Q").

37. On or around April 29, 2013, Meals on Wheels, Northampton informed RTG that it would no longer be purchasing trays from RTG.  (See Exhibit "R").

38.     Despite Meals On Wheels Northampton cancelling service with Plaintiff, Plaintiff attempted to retain Meals On Wheels Northampton as a client and informed them that Curwood was under contract, which precluded Curwood from providing services to Meals On Wheels Northampton through anyone other than Plaintiff.  (See Exhibit "S").

39.     Upon information and belief, Curwood is selling trays directly to Meals on Wheels Northampton and/or selling trays to third parties who are selling Curwood trays to Meals on Wheels Northampton in violation of RTG's contract with Curwood.

40.     Curwood further informed RTG that it could not prevent Oliver Company from selling its tray to Meals On Wheels Northampton, despite the fact that Meals On Wheels Northampton was a "protected" customer of RTG, in direct violation of Curwood's contract with RTG.

### Cease and Desist Letter

41.     On August 25, 2011, RTG received a letter with attachments from "Price Heneveld, LLP, Intellectual Property Attorneys" informing it that they were writing on behalf of Oliver Packaging and Equipment Company. (See Exhibit "T").

42.     Price Heneveld informed RTG that it had come to Oliver's attention that RTG was "offering food trays covered by [Oliver's] soon to issue trademark registration."

43.     Price Heneveld informed RTG that its "offer for sale and sale of goods as covered by the above-referenced trademark, are a violation of [Oliver's] trademark rights," and that RTG "immediately cease and desist the advertising and offer for sale of any products covered by [Oliver's] trademark registration, or any colorable imitations thereof."

44.     RTG, not being the manufacturer of the tray, and being in no position to know whether or not the tray manufactured by Curwood violated Oliver's trademark forwarded the cease and desist letter to Defendant, Curwood.  Plaintiff was assured by Defendant that there was no problem with the distribution of the tray, and that Defendant would prepare a response to Oliver.  (See Exhibit "U").

45.     On August 26, 2011, RTG was scheduled to attend a Meals On Wheels Chicago trade show wherein it had planned to promote and offer for sale Curwood's tray that was the subject of the Cease and Desist Letter.

46.     RTG requested that Curwood provide its position regarding whether or not its tray violated Oliver's trademark and whether or not RTG should promote and offer for sale Curwood's tray at the Trade Show.  Defendant responded that there was "no problem." (See Exhibit "M").

47.     Curwood, fully informed of Oliver's Cease and Desist Letter, and fully informed that RTG would be attending a trade show in which it would promote and sell Curwood's tray, informed RTG that it should continue to sell Curwood's tray. (See Exhibit "V").

48.     RTG, in reliance upon Curwood's representations, attended the Trade Show and continued to promote and sell Curwood's products.

49.     On September 6, 2011, after it had returned from the trade show, RTG again sought information from Curwood and its legal department regarding the Cease and Desist letter it had received from Oliver's attorneys.  (See Exhibit "W").

50.     RTG informed Curwood that it continued to be concerned about the Cease and Desist letter concerning Curwood's tray because it had sold two (2) packaging machines which were designed specifically to fit the tray produced by Curwood, and that it had orders for three (3) more packaging machines to fit Curwood's tray. (See Exhibit "X").

51.     Each packaging machine sold by RTG, in reliance upon its agreement with Curwood, is manufactured and tailored to fit the tray that RTG had been buying from Curwood.

52.     RTG informed Curwood that it needed to know the status of Curwood's tray because the packaging machines it had sold, or for which it had orders, would require modifications if Curwood's tray did in fact infringe upon Oliver's trademark and could not be sold or supplied to RTG's customers. (See Exhibits V-X).

53.    RTG informed Curwood that the modifications required to retro fit each packaging machine would cost approximately $3,000.00-$5,000.00 and that RTG needed to know the status of Curwood's tray as soon as possible.

54.    Curwood informed RTG that its legal department would handle the matter and that RTG should continue to service its accounts and could rely on Curwood's tray for distribution to all of RTG's protected clients.

55.    On September 14, 2011, Paul Vandenhevval, Director of Marketing for Curwood sent RTG a copy of design drawings for a revised tray intended to fit RTG's existing packaging machines. The revised tray was based upon photos provided by RTG and would not require any retro-fit.  (See Exhibit "Y").

56.    James W. Clements, Research Associate at Curwood, noted that the new product number for Curwood's revised tray would be 11027. (See Exhibit "Z").

57.    Clements stated that the "trim dimensions and overall height are the same as the original," but that the compartment capacities had been changed from "428 cc and 188 cc to "430 cc and 187 cc".

58.    Clements further noted that the "compartment shapes and sidewall angles are different" and that it had "changed the stack feature from corner lugs at the flange to bottom lugs."  Clements noted that he had "validated the fit" with the existing packaging machines sold by RTG.

59.    On September 14, 2011, Vandenhevval also informed RTG that Curwood's legal department was preparing a response to Oliver's Cease and Desist letter on RTG's behalf and that the response would be forwarded to RTG. (See Exhibits V-X).

60.    The response to Oliver's Cease and Desist letter composed by Curwood and forwarded to RTG stated: "I am writing in response to your correspondence of August 25 and September 8, 2011. My understanding is that a representative of Curwood Arkansas Inc. will be contacting you in due course in response to your letters."  (See Exhibit "AA").

61.    RTG forwarded this email, composed by Curwood, to a verified email address of Oliver on September 16, 2011.   (See Exhibit "BB")

62.    Thereafter, RTG met with Curwood in Las Vegas, NV at the Las Vegas Package Expo Trade Show.

63.    Pursuant to that meeting between RTG and Curwood, Curwood decided that RTG could continue to sell, and provide to its protected customers, the original Curwood tray that it had been selling and that was the subject of Oliver's Cease and Desist letter.

64.    Curwood assured RTG that if Oliver continued to assert a trademark issue, Curwood would simply honor their agreement with RTG by providing to RTG the re-designed tray.

65.    After the Vegas Packaging Expo, RTG spoke with Meals On Wheels Northampton, a Curwood protected customer of RTG.  During that discussion, an existing RTG client/customer informed RTG that Oliver was selling the Curwood tray at a reduced price, thereby, pricing RTG out of the account, in clear violation of Plaintiff's contract with Defendant. (See Exhibit BB-1).

### Aramark Issues Arise

66.    On May 29, 2013, Curwood was contacted directly by K.C. Jefferson, a previous employee of Aramark and/or Philadelphia  Department of Corrections, who began working for Correctional Food Service Consultants of New Jersey.

67.    Prior to contacting Curwood directly, K.C. Jefferson phoned RTG on or about May 29, 2013 and purposefully misidentified himself as an employee of Aramark, and informed RTG that he was with Aramark. Jefferson inquired as to what price RTG could deliver their trays to Aramark.

68.    K.C. Jefferson and Correctional Food Service Consultants requested a "direct quote" from Curwood on tray pricing for RTG's "protected" account with Aramark/Philadelphia Department of Corrections.

69.     Pursuant to the above-described phone call, RTG informed Curwood, Peter Wright, and Paul Vandenhevvel that Jefferson and Correctional Food Service Consultants would be contacting them for a quote on Plaintiff's protected account with Aramark/Philadelphia Department of Corrections with the intent of interfering with the contract between Plaintiff and Defendant armed with the proprietary information obtained through subterfuge.

70.     RTG informed Curwood that Aramark/Philadelphia Department of Corrections was an approved and protected RTG account and that all contact regarding that account be directed to RTG.

71.     Curwood, in violation of its agreement to protect RTG and not quote pricing either directly or to third parties, engaged in the process of providing a quote to Jefferson and Correctional Food Service Consultants.

72.     Curwood illegally, and in violation of its contract with RTG, failed to direct Jefferson and Correctional Food Services Consultants to contact RTG.

73.     Upon information and belief, Curwood illegally, and, in violation of its contract with RTG, provided a direct quote to Jefferson and Correctional Food Services Consultants for RTG's approved and protected account with Aramark/Philadelphia Department of Corrections.

74.     Upon information and belief, Aramark/Philadelphia Department of Corrections contacted Curwood in order to buy trays directly from them, rather than through RTG, Curwood's approved and protected distributor for the account.

75.     On June 14, 2013, Aramark/Philadelphia Department of Corrections stopped buying trays from RTG.

76.     Upon information and belief, Curwood is selling trays directly to Aramark/Philadelphia Department of Corrections and/or is selling trays to third parties who are selling Curwood trays to Aramark/Philadelphia Department of Corrections in violation/breach of RTG's contract with Curwood.

**Meals on Wheels of Central Maryland Issues Arise**

77.     On July 18, 2011, RTG provided Curwood with a Distributor Lead Form identifying Meals on Wheels of Central Maryland as a potential new client. (See Exhibit "CC").

78.     On July 19, 2011, Curwood informed RTG that it was approved for the Meals on Wheels of Central Maryland account and that "the account is now on a protected list . . .." Curwood further stated that "[a]ll contact to the customer will be directed thru your company." (See Exhibit "DD").

79.     On January 31, 2013, Meals on Wheels of Central Maryland informed RTG that it would no longer be purchasing trays from RTG.

80.     RTG lost the Meals on Wheels of Central Maryland account. Upon information and belief Curwood is selling its trays to Meals on Wheels of Central Maryland and/or is selling its trays to third parties who are providing those trays to Meals On Wheels Central Maryland in violation of its agreement with RTG.

## Meals on Wheels, Northampton Issues Arise

81.     On July 18, 2011, RTG provided Curwood with a Distributor Lead Form identifying Meals on Wheels, Northampton as a potential new client. (See Exhibit "EE").

82.     On August 11, 2011, Curwood informed RTG that it was approved for the Meals on Wheels, Northampton account and that "the account is now on a protected list . . .." Curwood further stated that "[a]ll contact to the customer will be directed thru your company."   (See Exhibit "FF").

83.     On April 29, 2013, Meals on Wheels Northampton informed RTG that it would no longer be purchasing trays from RTG.  (See Exhibit "R").

84.     RTG lost the Meals on Wheels Northampton account.  Upon information and belief Curwood is selling its trays to Oliver and /or is selling its trays to other third parties who are providing those trays to Meals on Wheels Northampton in violation of its agreement with RTG.

## The Impact Of Curwood's Conduct On RTG's Business

85.     Between October 2011 and September 2013, RTG purchased $1,448,991.72 worth of trays from Curwood.

86.     Curwood's knowing and malicious conduct has foreclosed RTG from maintaining contracts with, or entering into contracts with, more than 39 companies, including, but not limited to:

- Meals for the Elderly, San Angelo, TX
- Community Kitchen, Inc., Rockford, IL
- Meals On Wheels of Manatee, Bradenton, FL
- Senior Meals Program, Inc., Grandville, MI
- Central Virginia Area Agency on Aging, Inc., Lynchburg, VA
- Senior Connections, Atlanta, GA
- Senior Solution, Anderson, SC
- Meals On Wheels of Sheboygan County, Sheboygan WI
- Hawkeye Valley Area Agency on Aging, Waterloo, IA
- Horizons, a Family Service Alliance, Cedar Rapids, IA
- Christian Senior Services, San Antonio, TX
- JA Foods Service, Buchman, MI
- Cheer, Georgetown, DE
- Wesley Community Services, Cincinnati, OH
- Meals On Wheels of Knoxville, TN
- Meals On Wheels of Osceola, FL
- Meals On Wheels of Longmont, CO
- New Opportunities, Inc., Waterbury, CT
- Meals On Wheels of Prescott, AZ
- St. Josephs Community Services, Inc., Merrimack, NH
- Trumbull Mobile Meals, Warren, OH
- Senior Resource Association, Vero Beach, FL
- State College Meals on Wheels, PA
- Real Services, South Bend, IN
- Meals On Wheels of Faulkner County, AK
- Life Care Alliance, Columbus, OH
- Mobile Meals, Spartanburg, SC
- Sodexo, OH
- St. Louis Area Agency on Aging, St. Louis, MO
- Hoffman Catering House, IL
- Meals On Wheels CCCSO, WV
- The Licking County Aging Program, Inc., Newark, OH
- Monroe City Senior Nutrition, Monroe City, MO
- Spectrum Generations, August, ME
- County of Passaic, Wayne, NJ
- Meals On Wheels, Raleigh, NC
- Meals On Wheels and More, Austin, TX
- Jeanie Marshal Foods
- Exquisite Catering, North Miami, FL
- Metro Correctional Center, Chicago, IL
- Compass Group USA, Chalfont, PA

- Penn Jersey Paper, Philadelphia, PA
- Food Service Partners/Sodexo, NY, VA, CA
- Meals On Wheels, Central Maryland, Baltimore, MD
- Little Farm Frozen Foods, TX
- Indiana Corrections, IN
- Platinum Packaging
- Valley Services, Jackson, MS
- Derringer Catering Company, Cincinnati, OH
- Sun Meadow/GA Foods, St Petersburg, FL
- Home, Healthcare, Hospice & Community Services, Keene, NH
- BTC Foods Inc., Philadelphia, PA
- Bamboo-Eco Enterprises, OR
- Linton's Managed Services, East Norriton, PA
- WBC Opportunities, Georgetown, TX
- Lifescape Community Services, Rockford, IL
- Thomas Paige Catering, Cleveland, OH
- Signature Foods, Inc., Columbia MO
- Alameda Corrections/Aramark, CA
- Cincy Senior Services
- Valley Food Systems, Youngstown, OH
- Dietert Center, Kerrville, TX

(See Exhibits "HH" and "II").

87.     Because of Curwood's actions RTG lost renewal of its existing contracts with Meals on Wheels of Central Maryland, Meals on Wheels Northampton, Valley Services and Aramark/Philadelphia Department of Corrections, thereby losing relationships that, but for Curwood's illegal conduct, could have been expected to last for years to come.

88.     Other companies were interested in utilizing RTG's services after being approached by RTG, who was seeking to expand its business[3]. Because of Curwood's illegal conduct, RTG was foreclosed from potential contracts with various customers/companies.

89.     The instances of Curwood's interference with RTG's business relationships and contracts are numerous, causing RTG damages in excess of $10,000,000 or an amount to be proven at the time of trial, pursuant to evidence.

---

[3] See list in Paragraph 86.  This list is not exhaustive.

## FIRST CAUSE OF ACTION

### Breach of Contract

90.     Paragraphs 1 through 89 are incorporated by reference as if fully set forth herein.

91.     In order to plead a proper claim for breach of contract under Pennsylvania law, a plaintiff must allege: (1) the existence of a valid and binding contract to which [s]he and the defendant[s] were parties; (2) the contract's essential terms; (3) that [s]he complied with the contract's terms; (4) that the defendant[s] breached a duty imposed by the contract; and (5) damages resulting from the breach.

92.     As outlined above, Curwood executed a contract with RTG.  At all times relevant hereto the contract constituted a valid and enforceable contract between RTG and Curwood.

93.     Pursuant to the contract agreed to by the parties Curwood promised to protect any account for which RTG submitted a Distributor Lead Form, which was approved by Curwood.

94.     RTG has performed all of the conditions, covenants and promises required to be performed in accordance with the terms and conditions of the contract, by providing to Curwood the information required to be approved as a protected distributor of Curwood's products.

95.     Curwood breached the contract by failing to protect RTG as promised and by selling Curwood products either directly to RTG protected customers or by selling its product to third parties, who then sold Curwood products directly to RTG protected customers.

96.     As a direct and proximate result of the breach of the contract by Curwood, RTG has sustained substantial general, special, consequential and incidental damages in an amount presently unknown, but in excess of the minimal jurisdictional limit of this Court.  RTG will establish the precise amount of damages at trial, according to proof.

WHEREFORE, RTG demands judgment against Curwood in an amount to be proven at trial, and such other and further relief as may be just, proper and allowable, including pre-judgment and post-judgment interest, attorneys' fees and the costs of this suit.

## SECOND CAUSE OF ACTION
### Intentional Interference with Contractual Relations

97.     Plaintiff RTG repeats the allegations contained in paragraphs 1 through 96 above and incorporates such allegations by reference herein.

98.     To establish a claim of intentional interference with existing contractual relations, plaintiff must prove that: (1) there is an existing contractual relationship between plaintiff and a third party, (2) it was defendant's intent that its actions cause the third party to violate its contract with plaintiff, (3) defendant's actions were improper, i.e., there was no privilege or justification for the actions, and (4) plaintiff suffered damages as a result of defendant's actions. Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1388 (3d Cir. 1991).

99.     As described above, RTG's contractual relationship with Curwood included approved and protected accounts with Meals on Wheels of Central Maryland, Aramark/Philadelphia Department of Corrections, Meals on Wheels Northampton, and Valley Foods.  RTG also had contracts with Meals on Wheels of Central Maryland, Aramark/Philadelphia Department of Corrections, Meals on Wheels Northampton, and Valley Foods.

100.     At all relevant times, Curwood was aware of and knew of the existence of the contracts between RTG and Meals on Wheels of Central Maryland, Aramark/Philadelphia Department of Corrections, Meals on Wheels Northampton, and Valley Foods.

101.     RTG is informed and believes and thereon alleges that, in a purposeful effort to interfere with RTG's rights under these contracts, Curwood began selling its products directly to Meals

on Wheels of Central Maryland, Aramark/Philadelphia Department of Corrections, Meals on Wheels Northampton, and Valley Foods and/or sold its products to third parties who then sold those products to Meals on Wheels of Central Maryland, Aramark/Philadelphia Department of Corrections, Meals on Wheels Northampton, and Valley Foods.

102.   In doing so, Curwood intended to disrupt the contracts between RTG and Meals on Wheels of Central Maryland, Aramark/Philadelphia Department of Corrections, Meals on Wheels Northampton, and Valley Foods, and to foreclose RTG from continuing its contractual relationships with Meals on Wheels of Central Maryland, Aramark/Philadelphia Department of Corrections, Meals on Wheels Northampton, and Valley Foods.

103.   Curwood did in fact disrupt RTG's contracts with Meals On Wheels of Central Maryland, Aramark/Philadelphia Department of Corrections, Meals on Wheels Northampton, and Valley Foods, and foreclose RTG from these contracts by selling its products directly to those companies and/or selling its products to third parties who then sold those products to RTG's customers.

104.   Curwood engaged in the conduct alleged herein with the intent to harm RTG financially and to induce Meals on Wheels of Central Maryland, Aramark/Philadelphia Department of Corrections, Meals on Wheels, Northampton, and Valley Foods to violate their Agreements, and/or to make the contractual relationship between Meals on Wheels of Central Maryland, Aramark/Philadelphia Department of Corrections, Meals on Wheels, Northampton, and Valley Foods, and RTG less financially attractive to the customer thus, inducing them to leave RTG and buy directly from Curwood.

105.   In interfering with the contracts between RTG and Meals on Wheels of Central Maryland, Aramark/Philadelphia Department of Corrections, Meals on Wheels, Northampton, and Valley Foods, Curwood acted with malicious purpose, driven by the intent to prevent RTG from continuing to service its customers in order to allow Curwood to take over the business.

106.   Curwood's conduct caused RTG to lose the $1.1 Million Dollar annual contract with

Aramark/Philadelphia Department of Corrections, which RTG reasonably expected to maintain for years to come, but for Curwood's interference. Curwood acted with the intent to sell its products to the customers that had been developed by RTG and who RTG reasonably expected to be "protected" under its contract with Curwood.

107.    Curwood's conduct caused RTG to lose the $155,000 annual contract with Meals on Wheels of Central Maryland, which RTG reasonably expected to maintain for years to come, but for Curwood's interference.  Curwood intentionally sold its products to the customers that had been developed by RTG and whom RTG reasonably expected to be protected under its contract with Curwood.

108.    Curwood's conduct caused RTG to lose the $115,000 annual contract with Meals on Wheels Northampton which RTG reasonably expected to maintain for years to come, but for Curwood's interference.  Curwood intentionally sold its products to the customers that had been developed by RTG and whoM RTG reasonably expected to be protected under its contract with Curwood.

109.    As a proximate result of the conduct of Curwood as alleged herein, RTG was damaged in an amount in excess of the statutory amount, the exact amount of which will be proven at time of trial.

110.    The conduct of Curwood, as alleged herein, was purposeful and intentional and was engaged in for the purpose of depriving RTG of property or legal rights or to otherwise cause injury, and was despicable conduct that subjected RTG to cruel and unjust hardship in conscious disregard of its rights, and was performed with fraud, oppression or malice so as to justify an award of exemplary or punitive damages against Curwood in an amount according to proof at trial.

## THIRD CAUSE OF ACTION

## Intentional Interference with Prospective Contractual Relations

111.    Plaintiff RTG repeats the allegations contained in paragraphs 1 to 110 above and incorporates such allegations by reference herein.

112.    To prove a claim of intentional interference with prospective contractual relations, plaintiff must show that (1) a reasonable probability of a contract between plaintiff and a third party existed, (2) it was defendant's intention that its actions interfere with that probable contract, (3) there was no privilege or justification for defendant's actions, and (4) plaintiff incurred actual damages as a result of defendant's actions. Nathanson, 926 F.2d at 1392.

113.    Pennsylvania recognizes a cause of action for tortious interference with prospective contractual relations. See, Glenn v. Point Park College, 272 A.2d 895, 897 (Pa. 1971) ("We see no reason whatever why an intentional interference with a prospective business relationship which results in economic loss is not as actionable as where the relation is presently existing . . ."). The alleged injury here is damage to RTG's prospective business relationships.

114.    As described above, RTG was in mature/long standing negotiations with numerous customers (See footnote 1) to supply them with packaging machines, trays and films. Curwood was aware that RTG continued to develop clients and was engaged in contract negotiations with the aforementioned customers (See footnote 1.) in order to service its prospective clients. Curwood was aware that RTG relied upon the agreement between Curwood and RTG as described herein to service its current clients as well as prospective clients.

115.    Curwood was aware that other vendors were attempting to contract with these customers. Upon learning of RTG's negotiations with these customers, Curwood informed RTG that it would sell products and/or could not control where its products were sold causing these customers to forego contracting with RTG. In doing so, Curwood intended to disrupt the prospective contractual relationships between RTG and prospective customers and to foreclose RTG from those contracts, with no privilege or justification for their actions.

116.    Curwood did in fact disrupt RTG's contract with these customers named throughout this complaint, and foreclose RTG from those contracts by causing those companies to buy directly from Curwood or from third parties supplied by Curwood.

117.    Curwood's interference not only caused RTG to lose in excess of $1.4 Million in annual contracts, but also precluded RTG from securing numerous additional contracts with prospective clients of significant and untold value. Curwood intentionally sought to take over RTG's customers and/or supply those customers with Curwood products through third parties.

## FOURTH CAUSE OF ACTION

### Fraudulent Misrepresentation

118.    Plaintiff repeats and re-alleges each allegation set forth herein.

119.    Curwood represented to RTG that, among other things, they would protect RTG on any account, for which a Distributor Lead Form was submitted to and approved by Curwood.

120.    Additionally, Curwood represented that they would not sell directly to any account for which RTG was approved and protected, nor would they sell to any third party who would sell to any account for which RTG was approved and protected.

121.    Curwood was responsible for the review of, and approval of, all accounts identified, developed, and secured by RTG.  As the party responsible for reviewing and approving RTG's Distributor Lead Form submissions and the party responsible for the protection of RTG's accounts, Curwood had a duty to refrain from making fraudulent statements and to rectify any and all material misrepresentations and omissions once they became apparent/known.

122.    Curwood's representations that they would protect RTG and place all of RTG's accounts on a protected list were false.  Curwood's representations that they would not sell directly to any account for which RTG was approved and protected and/or sell to any third party who would then sell to any account for which RTG was approved and protected were false.  Curwood's representation that

any inquiry or any contact regarding any account for which RTG was approved and protected would be directed to RTG was false.

123.     Curwood failed to protect RTG's approved accounts.  Upon information and belief Curwood sells directly to accounts for which RTG was approved.  Upon information and belief Curwood sells to third parties who then sell to accounts for which RTG was approved.  Upon information and belief Curwood did not, and does not, direct inquiries or contact regarding RTG's approved accounts to RTG.

124.     Curwood made these representations with knowledge of their falsity, reckless disregard for their truth, or without reasonable grounds for believing the representations to be true when they were made.  Curwood never intended to protect RTG on their accounts.

125.     Curwood promised to protect RTG on its approved accounts and not to sell directly or through any third parties to RTG's protected accounts without ever intending to comply with its representations, in order to induce RTG to enter into the contract and develop leads and sales for Curwood's benefit.  RTG's reliance upon Curwood's representation that its clients would be protected was reasonable, and RTG suffered damages in reliance upon Curwood's representations.

126.     Curwood intended that RTG would rely on the representations in continuing to provide it with sales leads, and continue to service and maintain its accounts until such time as Curwood undertook the process of selling directly to those accounts or undertaking the prospect of finding other third parties to take over servicing those accounts to the benefit of Curwood and the detriment of RTG.

127.     RTG justifiably relied on Curwood's representations and it was not otherwise apparent that Curwood's assertions were false at the times they were made.

128.     Curwood's misrepresentations caused RTG to expend capital in continuing to develop new business/new accounts, invest in equipment and product supplies, acquire real estate, increase warehouse capacity, when it was known to Curwood that the decision to sell directly to RTG's account had already been made.

129.    As a direct and proximate result of all Curwood's actions RTG has suffered damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Willful Breach of Covenant of Good Faith and Fair Dealing

130.    RTG repeats, and re-alleges, each allegation set forth herein.

131.    The contractual relationship between RTG and Curwood included an implied covenant of good faith and fair dealing, which requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract. A breach of the covenant of good faith and fair dealing may occur even without violating an express term of the contract. Implied in the agreement was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of the agreements.

132.    Curwood failed to perform its obligations in good faith under the agreement by knowingly and intentionally, selling its products directly to RTG's protected customers and/or selling its products to third parties that Curwood knew were selling to RTG's protected customers.

133.    Curwood's actions were undertaken in bad faith, for the sole purpose of benefiting Curwood at RTG's expense. Curwood's conduct in selling its product directly to RTG's protected customers and/or selling its product to third parties who in turn sold Curwood products to RTG's protected customers served Curwood's own financial purposes and self-dealing motivations.

134.    Curwood's conduct was done in bad faith, by willful misconduct, fraud and gross negligence, and deprived RTG of a number of bargained-for benefits under their contract with Curwood, and therefore breached the duty of good faith and fair dealing.

135.     As a direct and proximate result of Curwood's knowing, intentional, and bad faith violation of the agreement's implied covenant of good faith and fair dealing, RTG has suffered damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment

136.     Plaintiff re-alleges each allegation above as if fully set forth herein.

137.     By their wrongful acts and omissions, Curwood was unjustly enriched at the expense of and to the detriment of RTG and has interfered with RTG's protected interests.

138.     As described above, Curwood knowingly acted in an unfair, unconscionable, and oppressive manner towards RTG in failing to protect the accounts developed and cultivated by RTG and as approved by Curwood.

139.     As described above, Curwood acted in conscious disregard for RTG's rights. Through their unlawful conduct, Curwood knowingly received and retained wrongful financial and other benefits at RTG's expense.

140.     As a result of their unlawful conduct, Curwood has realized substantial ill-gotten gains by selling directly to RTG's protected accounts or selling to third parties who then sell to RTG's protected accounts.

141.     As a direct and proximate result of Curwood's unlawful and improper conduct, as set forth above, Curwood has been unjustly enriched and RTG has suffered damages. Curwood's retention of funds under these circumstances constitutes unjust enrichment, as Curwood has no right to the benefits that were obtained through their unlawful conduct.

142.     The financial benefits that Curwood derived from their unlawful conduct alleged above rightfully belong to RTG. The Court should compel Curwood to disgorge to RTG all unlawful or

inequitable proceeds that Curwood received.

## SEVENTH CAUSE OF ACTION

### Promissory Estoppel

143. Plaintiff realleges each allegation as if fully set forth herein.

144. To state a claim for promissory estoppel, Plaintiff must allege: (a) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; (b) the promisee actually took action or refrained from taking action in reliance on the promise; and (c) injustice can be avoided only by enforcing the promise."

145. As stated above, Curwood represented to RTG that, among other things, Curwood would protect RTG on any account for which a Distributor Lead Form was submitted and approved by Curwood.

146. Additionally, Curwood represented that they would not sell directly to any account for which RTG had been approved and protected, nor would they sell to any third party who would sell to any account for which RTG was approved and protected.

147. Based on these promises from Curwood, RTG submitted to Curwood information that was essential about its customer base, with the reasonable understanding that if a customer was approved an protected, Curwood would not use that information to sell directly to RTG's customers. RTG's reliance was reasonable and justified under the circumstances.

148. As stated at length above, Curwood then broke these promises by engaging directly in business with RTG's protected customers, and by dealing with third parties who then sold to RTG's protected customers.

149. Curwood took the actions outline in Paragraph 148 above with full knowledge that RTG was relying upon Curwood's earlier promises to refrain from such conduct.

150. As a result of Curwood's failure to honor its promises, RTG has suffered damages in the form of lost business, lost profits, lost potential clients, and other financial harm.

## PRAYER FOR RELIEF

WHEREFORE, RTG prays for judgment against Curwood as follows:

1.      For compensatory damages in a sum in excess of $10,000,000 Dollars, or according to proof at trial; and

2.      For exemplary or punitive damages in an amount according to proof at trial;

3.      For costs of suit incurred herein;

4.      For attorneys' fees as allowable by law; and

5.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff RTG, Inc., hereby demands a trial by jury in this matter.

RESPECTFULLY SUBMITTED,

**Brian J. Grady, Esquire**

25

## **VERIFICATION**

Michael Cheatle deposes and states that he is authorized to make this verification on behalf of the Plaintiff, and that the facts alleged in the foregoing are true and correct based upon his personal knowledge, except as to the matters herein stated to be alleged on information and belief, and that as to those matters he believes them to be true.  In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. This *19*th day of September, 2014.

9-19-14

Michael Cheatle, Division Manager

## **VERIFICATION**

Robert Cheatle deposes and states that he is authorized to make this verification on behalf of himself and that the facts alleged in the foregoing are true and correct based upon his personal knowledge, except as to the matters herein stated to be alleged on information and belief, and that as to those matters he believes them to be true.  In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct based upon my personal knowledge. This *19*th day of September, 2014.

_____   9-19-14
Robert Cheatle, CEO
Roberts Technology Group, Inc.