IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERTS TECHNOLOGY GROUP, INC. | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | NO. 14-5677 |
| | : | |
| CURWOOD, INC. | : | |

## OPINION

**KEARNEY, J.**                                           September 23, 2015

Pennsylvania contract law enforces supply agreements between a distributor and manufacturer based on definite terms. Distributors assume substantial risk electing to work with a manufacturer relying upon uncertain terms in an email exchange with no obligation to produce product for a defined period of time. Here, the Plaintiff distributor relied on the Defendant manufacturer's email promise to "protect" Plaintiff's new customers without defining how long the obligations last. We now address what happens when Plaintiff's new customers decide to end relationships with Plaintiff and begin buying the same product from the Defendant manufacturer or its agents. Plaintiff, having decided to build a warehouse for its new business line based on its legal interpretations and internal sales formulas, now seeks damages from the Defendant manufacturer for servicing its "protected" customers under contract theories and duplicative tort claims. Plaintiff cannot obtain contract damages for losses beyond the parties' termination of their agreement. The parties, however, have not shown when their agreement ended and we find genuine issues of material fact whether Defendant breached its promise to "protect" Plaintiff's accounts before termination when it entered into a separate agreement to supply the product line directly to the customers after it decided to stop doing business with Plaintiff. In the accompanying Order, we grant Defendant's motion for summary judgment on

all claims except for damages arising from a breach of contract as we find genuine issues of material fact as to whether Defendant failed to "protect" Plaintiff's relationship with its customers before their agreement terminated at some disputed unknown date.

## I.   UNDISPUTED FACTS[1]

Since 1995, Plaintiff Roberts Technology Group ("RTG") distributed machines which place a clear plastic film around trays and cartons housing its customers' products.  (A. at 12.)  RTG supplied these machines to their clients who package their own products.  (*Id.*)  In 2011, RTG decided to enter the tray distribution business for food vendors as part of its business plan. (*Id.* ¶ 17.)  In 2001,  RTG approached Defendant Curwood, Inc. ("Curwood"), a tray manufacturer, seeking to have it produce as many trays as RTG may need for expanding its services to also provide the tray to its customers.[2]  (PCSF, ¶ 18; SUMF, ¶ 4.)

### *Basis of relationship between RTG and Curwood.*

The parties negotiated through email.  (SUMF, ¶ 7; PCSF, ¶ 7.)  The parties agreed RTG would distribute Curwood trays.  When RTG obtained customers, Curwood required RTG to submit Distributor Lead Forms with detailed information regarding the customer.  (PCSF, ¶ 20; A. at 143.)  The information on the Distributor Lead Form included "the customer's name;

---

[1]     The Court's Policies require a Statement of Undisputed Material Facts ("SUMF") filed in support of a summary judgment motion. Defendant filed its SUMF at ECF Doc. No. 43-1. Plaintiff responded to Defendant's SUMF and included a Counter Statement of Material Facts ("PCSF") it contends create a genuine issue of material fact at ECF Doc. No. 59. The party moving for summary judgment must also submit an appendix of exhibits or affidavits. Defendant's appendix appears at ECF Doc. No. 43. The responding party may submit additional exhibits.   Plaintiff submitted additional materials to the appendix at ECF Doc. No. 60. References to the appendix in this opinion shall be referred to as "A" followed by the Bates number, for example, "A. at 1."

[2]      For example, RTG sold the tray sealing material and machinery to food vendors before 2011 but did not provide the tray.  (PCSF, ¶¶ 15-16.)   Food vendors such as Aramark use Curwood's trays for prepackaged meals, with the film from RTG's machines placed over the tray and stored until consumed.

location; contact person; and the estimated number of trays the customer would need." (PCSF, ¶ 20.)  Curwood used this information to insure RTG's potential customers were not already customers of Curwood or any of its existing distributors.[3] (A. at 518; PCSF, ¶ 21.)

RTG submitted a Distributor Lead Form on July 19, 2011 for a potential customer Aramark for approximately eight million trays per year.  (A. at 459.)    On the same day, RTG asked Curwood to agree "once we are distributing to a facility we are 100% protected."  (*Id.* at 458.)  RTG did not define "protected."    Curwood approved the Distributor Lead Form, "[t]his account is now on a Protected list within the region.  All contact to the customer will be directed thru [sic] your company."  (*Id.* at 459.)    Peter Wright, a Curwood sales representative responsible for RTG, testified the protection would last "as long as [RTG] maintained a good working relationship with their end customer."  (*Id.* at 277.)  While Wright did not memorialize this in writing, he testified telling RTG of this "as long as" protection.  (*Id.*)  While RTG now asserts its email distribution agreement with Curwood lasted indefinitely, there is no evidence the parties ever discussed a perpetual obligation for Curwood to manufacture food trays at RTG's demand.    This is the entirety of the parties' written obligations.  RTG and Curwood did not define the duration of their relationship.

RTG secured multiple customers approved by Curwood on the Distributor Lead Form. (PCSF, ¶ 26.)  For example, the parties focused on a larger customer Aramark. RTG obtained Aramark, who provided food services for the Philadelphia correctional facilities.  RTG signed agreements with Aramark first for a period of three months, then another three months, and then

---

[3] RTG competed with distributors of Curwood products.  For example, six weeks into the relationship, Oliver Packaging and Equipment Company ("Oliver") sent a cease and desist letter to RTG claiming RTG sold Curwood food trays covered by Oliver's trademark. (ECF Doc. No. 1, ¶ ¶ 41, 42.)  RTG requested Curwood's guidance and Curwood resolved the issue.  (*Id.* ¶ 46.; A. at 471-84.)

for a period of one year beginning May 1, 2012, and ending April 30, 2013. (A. at 519).   RTG also contracted with various food providers, including Meals on Wheels and Valley Foods.  (*Id.* at 191-92, 206.)

RTG decided to build the warehouse to house food trays taking up too much space in the existing building structure.  (*Id.* at 35.)  In addition, RTG's sales manager forecasted, based on its tray sales, RTG would need six to eight truckloads of trays available for immediate delivery.  (*Id.* at 26.)  RTG did not inform anyone at Aramark it was building the additional warehouse.  (*Id.* at 159.)  RTG does not adduce evidence of telling any customer of its warehouse.  RTG's officer testified he informed Curwood officers of RTG's desire to build a warehouse.   (*Id.* at 158.)  In January 2012, RTG began construction of an 8,000 square foot warehouse attached to its existing offices.  (*Id.* at 24, 29.)   The warehouse cost approximately $700,000.   RTG completed construction by July 2012.  (*Id.* at 25, 157.)

### *Aramark and Curwood relationship.*

In October 2012, Curwood representatives ran into, apparently without prior planning, Aramark representatives at an industry expo.  (A. at 278.)   As Curwood's officer testified, Aramark told him "they were going to be moving away from a bundled package from RTG . . . ." (*Id.* at 279.)   According to Curwood, it told Aramark any issues with RTG would need to be addressed with RTG.  (*Id.*)  After returning from the expo, Aramark's representative continued to contact Curwood to discuss potential tray and film sales.  (*Id.* at 467.)   In January 2013, Curwood provided Aramark with a quote for film.  (*Id.* at 468.)

In February 2013, Curwood and Aramark began negotiating an agreement for trays and film for Aramark effective after the RTG and Aramark agreement expired on April 30, 2013.

(*Id.* at 470, 486-487, 489.)    Curwood and Aramark signed an agreement effective on May 1, 2013. (*Id.* at 497.)

The record is unclear when RTG's agreement with Curwood relating to Aramark terminated.  On or around May 13, 2013, Curwood told RTG, "Aramark has expressed intent to look for an alternative source of supply and has asked Curwood to quote directly… [a]s you can understand, we would like to keep the volume vs losing it to a manufacturing competitor…[w]e prefer that it be retained/serviced through a third party like RTG. Per our conversation, we will contact Aramark and again recommend that they contact RTG directly to resolve." (*Id.* at 391-93, 507).    The parties do not adduce any further evidence, on this record, to show when they terminated their Lead Distributor Form as to Aramark.

At some unknown point in 2013, RTG stopped buying trays from Curwood for any customer and never sought to buy trays from another manufacturer.  (SUMF, ¶ 6.)    RTG's officer testified RTG does not "work with competitors with any of our products in the sense of competing against each other."  (A. at 37.)

## II.  ANALYSIS

RTG seeks damages claiming Curwood: 1) breached a contract; 2) intentionally interfered with present and prospective contractual relations; 3) fraudulently misrepresented its intent at the outset of their relationship or concealed their negotiations with Aramark to RTG's detriment; 4) breached a covenant of good faith and fair dealing; and, 5) in the absence of a contract, RTG is owed contractual remedies under theories of unjust enrichment and promissory estoppel.  (ECF Doc. No. 1)   Curwood counterclaimed alleging breach of contract, unjust enrichment, and promissory estoppel.  (ECF Doc. No. 5)  Curwood now moves for summary

judgment on all of RTG's claims.[4]   (ECF Doc. No. 43)   As detailed below, we grant Curwood's motion in the accompanying Order as to all of RTG's claims except for breach of contract relating to contacts with any "protected" customer, including Aramark, until some presently unknown date of termination.

### A.   RTG's only possible contract claim arises from possible contact with "protected" customers before termination at a unknown or disputed date.

RTG claims Curwood breached an agreement to supply trays to RTG protected customers under its interpretation of "protected" in the parties' July 18 and 19, 2011 emails:

> RTG: "Can we please see the agreement stating that once we are distributing to a facility we are 100% protected.  This will be important for me to pass you my large customers name per our CEO"

> Curwood:   "This account is now on a Protected list within the region. All contact to the customer will be directed thru your company."

(A. at 458-59)

### *Either party can terminate the Agreement at will.*

Curwood's sole reason for summary judgment on the breach of contract claims is the agreement can be terminated at will.   Curwood argues the July 18-19 agreement (the

---

[4]   Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

"Agreement") did not contain a definite term and thus, under Pennsylvania law, it could terminate the Agreement at will.[5]   Curwood claims it exercised its right to terminate the Agreement and accordingly could not have breached any duty imposed by the Agreement after termination.   RTG counters the Agreement is ambiguous as to duration, allowing it to introduce parol evidence the parties actually intended the Agreement to last indefinitely.

Under Pennsylvania law, to establish a breach of contract RTG must show: (1) the existence of a contract including tis essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999).  If called upon to interpret the terms of the contract, we must use the parties' intent as its guiding light.  *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982).  "[W]hen the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Id.*  (citations omitted).

 "[W]hen a contract provides that one party . . . shall have exclusive sales rights within certain territory, but does not specify a definite time or prescribe conditions which determine the duration of the relation, the contract may be terminated by either party at will." *Slonaker v. P.G. Publ'g Co.*, 13 A.2d 48, 49 (Pa. 1940); *King of Prussia Equip. Corp. v. Power Curbers, Inc.*, 287 F. Supp. 2d 594, , 596 (E.D. Pa. 2003), *aff'd* 117 F. App'x 173 (2004) (finding distributorship agreement terminable at will).  This general rule creates a presumption that an agreement is terminable at will.  However, a party may overcome this presumption by offering evidence of "the surrounding circumstances, the situation of the parties, the objects they apparently have in

---

[5]     RTG does not define the contract between the parties.  It seems plausible the Agreement is the distributorship as a whole, established through emails as RTG suggests.  But the Court finds equally plausible each Distributor Lead Form constitutes a separate agreement, a theory not advanced by either party.  Either way, it does not change our analysis regarding the at will nature of such agreements.  RTG will ultimately bear the burden of proof at trial to show the existence of an enforceable agreement.

view, and the nature of the subject-matter of the agreement."[6]   *Slonaker*, 13 A.2d at 50-51.

Considering these factors, the Court may infer the parties intended the agreement to last for a

particular period.  *Id.* at 51.

The Agreement between the parties is silent when it comes to duration.  RTG admits this

silence, as it must, as it cannot point to any term of the Agreement explicitly setting a definite

duration.  (ECF Doc. No. 58, at 4.)   While the silence tends to show the parties intended the

Agreement terminable at will, the silence alone does not end our inquiry.

With no fixed durational term, we examine whether the Agreement "prescribe[d]

conditions" governing its duration.  *Slonaker*, 13 A.2d at 49; *see also D&M Sales, Inc. v.

Lorillard Tobacco Co.*, No. 09-2644, 2010 WL 786550, *4 (E.D. Pa. Mar. 8, 2010).  "Where an

agreement specifies the sole or exclusive conditions that will give rise to termination, it is

definite in duration and therefore not terminable at will as a matter of law.  In contrast, where an

agreement merely specifies conditions that *may* result in termination of the agreement, it is

indefinite in duration and terminable at will."   *D&M Sales, Inc.*, 2010 WL 786550, *3.

Additionally, for a contract to "prescribe conditions which shall determine the duration of [a]

relation" the condition must be of a "precise and unmistakable character."   *Slonaker*, 13 A.2d at

50; *Power Curbers, Inc.*, 287 F. Supp. 2d at 598.

---

[6]   RTG provides no citation to the applicable standard governing the Agreement and no
discussion of whether the Agreement is terminable at will.  Instead, RTG matter-of-factly asserts
Curwood's position is "not supported" under Pennsylvania and Third Circuit law.  Despite
RTG's assurance, it makes no attempt to distinguish any of the cases cited by Curwood in its
brief and moreover, does not address Curwood's arguments.  RTG's promise to demonstrate our
Court of Appeals' disdain for Curwood's argument never comes to fruition as RTG cites only
two cases from this Circuit regarding the breach of contract claim.  (Pl.'s Resp. in Opp., 3 (citing
*Hullett v. Towers, Perrin, Forster & Crosby*, 38 F.3d 107 (3d Cir. 1994), and *Buddy's Plant Plus
Corp. v. Centimark*, 978 F. Supp. 2d 523 (W.D. Pa. 2013)).   These cases do not address
Curwood's argument nor do they deal with the issue before us.

RTG points to Curwood's language granting RTG "protection" to show a prescribed condition.[7] (ECF Doc. No. 58, at 4-5.)  Peter Wright, a Curwood sales representative responsible for RTG, testified the protection would last "as long as [RTG] maintained a good working relationship with their end customer."  (A. at 277.)  While Wright did not memorialize this in writing, he testified to telling Michael Cheatle verbally.  (*Id.*)  RTG argues this "is direct evidence of Curwood's intent" to grant RTG a perpetual distributorship with no avenue of termination for anyone other than a third party—i.e. the end customer.  (ECF Doc. No. 58, at 7.)

We find this argument unavailing.  As Curwood observes, language such as "so long as" or "as long as" has been found too imprecise to "provide any specific guidelines for determining the duration of a contract."  *Fleming v. Mack Trucks, Inc.*, 508 F. Supp. 917, 920 (E.D. Pa. 1981); *Geib v. Alan Wood Steel Co.*, 419 F. Supp. 1205, 1208 (E.D. Pa. 1976) (citing cases reaching similar conclusion).  This phrase Curwood allegedly uttered to RTG is not so "precise and unmistakable" as to create a perpetual contract only terminable by a third party.  *Slonaker*, 13 A.2d at 50.

Our conclusion the Agreement is terminable at will is bolstered by Pennsylvania's disfavor for contracts of perpetual duration without clear and unequivocal terms evidencing the parties' intent to do so.  *D&M Sales, Inc.*, 2010 WL 786550, *3 (citing *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 n.5 (Pa. 1986)).  This policy makes good business sense as it appears unreasonable for parties to intend for contracts to last forever absent unequivocal terms.  Further, RTG's construction of the Agreement would leave the parties no ability to end the

---

[7]      Although RTG does not discuss the correct legal standard for determining whether a contract is terminable at will, it does claim the "as long as" language used Curwood negates Curwood's argument the agreement is terminable at will.  We will interpret this position as arguing the language is a prescribed condition of the Agreement and gives the agreement a durational term.

Agreement if the relationship between RTG and Curwood became strained.  It is unreasonable to construe the Agreement as perpetual where there is no evidence of a "precise and unmistakable" intent.  Accordingly, the Court finds the Agreement presumptively terminable at will.

RTG may overcome this presumption by proffering evidence of "the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement."  *Slonaker*, 13 A.2d at 50-51.  RTG spends the majority of its breach of contract argument discussing the parol evidence rule and its applicability in clarifying ambiguous terms.  (ECF Doc. No. 58, at 2-10.)  While the Court does not believe there is any ambiguous term pertaining to duration in the Agreement and does not endorse RTG's view as to the parol evidence rule, the Court will examine the extrinsic evidence proffered by RTG in the context of overcoming the presumption of termination at will.[8]

---

[8]     In attempting to overcome the at will presumption, RTG relies in part on the report of its expert, Torrey Bracken, to show custom in the industry or trade.  (*Id.* at 8-9.)  Specifically, Bracken concludes in his report it is "standard practice in the [i]ndustry to establish manufacturer-distributor relationships *via* the use of electronic mail communications."  (*Id.* at 8.)  This conclusion is irrelevant to our analysis at this stage as we are not deciding whether a contract existed between the parties.  Bracken concludes, "[u]nless there is a specific statement that the contract is terminable at will, the presumption in the [i]ndustry is that the manufacturer-distributor relationship will last perpetually, unless one or both of the companies dissolve, or if the distributor fails to adequately service end users on behalf of the manufacturer."  (*Id.* at 9.)

Bracken's opinion regarding the terminable at will nature of the Agreement between the parties is not helpful.  Initially, it is contrary to Pennsylvania law, as outlined above, with regard to terminable at will distributor contracts.  It is essentially the inverse of the law.  Pennsylvania law presumes distribution contracts to be terminable at will when they do not specify a term of duration.  *Slonaker*, 13 A.2d at 49.  Bracken would have contracts last forever unless the parties affirmatively state it is terminable at will.  This is not the law.  Bracken's report cannot create a genuine issue of material fact sufficient to get past summary judgment.  Bracken's report is an expert report not sworn to under penalty of perjury and accordingly is "not competent to be considered" in support of RTG's opposition.  *Burrell v. Minnesota Mining Mfg. Co.*, No. 03-391, 2011 WL 5458324, *1 (E.D. Pa. June 9, 2011) (citing *Fowle v. C&C Cola*, 868 F.2d 59, 67 (3d Cir. 1989) (citation omitted)) (refusing to consider expert report at summary judgment).  Bracken's expert report is in some respects irrelevant to our analysis and in others contrary to

RTG offers evidence regarding the conduct of the parties, as well as the surrounding circumstances and objects of the contracts to rebut the presumption of a terminable at will contract.[9]  According to RTG, if Curwood truly believed the Agreement was terminable at will, it should have terminated the Agreement in October 2012, "when Aramark allegedly told [Curwood] that it was experiencing service and relationship issues with RTG . . . ."  (ECF Doc. No. 58 at 7-8.) ("If the Defendant truly intended for the contract to terminable at will, it never would have exerted so much effort to create and internally document this alleged cause for unilaterally terminating the protection contract.")

This argument again relies on the assumption Curwood's "as long as" deposition language sufficiently creates a definite term of duration, which we have already found it is not.  This phrase is a condition to terminate the Agreement as opposed to defining the sole means of terminating the Agreement.  In this regard, we find it similar to the conditions in *D&M Sales, Inc.* where the agreement provided "conditions of performance and provide[d] that Plaintiff may be removed from the Program and lose its Direct Account status if it fails to satisfy those conditions."  2010 WL 786550, *4.  Judge Padova found these conditions insufficient to create a definite term of duration and dismissed the breach of contract claims.  *Id.*  While these conditions certainly could serve as grounds for termination, the agreement did not explicitly make them the

---

Pennsylvania law. Additionally, it is an unsworn expert report and not to be considered at summary judgment.

[9]     RTG also relies upon the "as long as" language communicated by Curwood to RTG. (ECF Doc. No. 58, 4-8.)  As the Court discussed this language and its inability to make this a contract of perpetual duration, the Court will not repeat its analysis here.

sole grounds for termination and therefore could not unequivocally create a definite term of duration.[10]  *Id.*

Here, Curwood's "as long as" language presents at least one way a party may terminate the Agreement without making it the only condition for termination.  Curwood's attempt to abide by a condition of the Agreement cannot serve as useful evidence of its intent for the Agreement to last perpetually.

RTG also claims Curwood knew it had just recently entered the tray distribution business and intended to remain in business for a while.  (ECF Doc. No. 58, at 9.)  According to RTG, it conveyed to Curwood its goal of sustaining a "long term relationship with a good, reliable supplier."  (*Id.*)  This goal is insufficient to overcome the presumption the Agreement is terminable at will.  *See Shuster's Builders Supplies, Inc. v. Peachtree Doors and Windows, Inc.*, No. 04-1585, 2006 WL 2773482, *5 (W.D. Pa. Sept. 25, 2006).

In *Shuster's*, a similar factual scenario led to the conclusion a distribution agreement was terminable at will.  The defendant Peachtree manufactured various building supplies including windows, patio doors, and entry doors.  *Shuster's*, 2006 WL 2773482, *1.  Plaintiff Shuster's entered into an agreement with Peachtree to become the exclusive distributor of various Peachtree product lines in Pennsylvania, Ohio, New York, and West Virginia.  *Id.*  The relationship deteriorated and Peachtree sought to terminate the distribution agreement.  *Id.* at *3.

---

[10]     Judge Padova compared two cases reaching differing conclusions regarding termination at will.  In *Bachman Co. v. Anthony Pinho, Inc.*, No. 91-5679, 1993 WL 64620 (E.D. Pa. Mar. 3, 1993), the court found the contract not terminable at will where the contract provided the "grant of distribution rights would continue until terminated as provided herein."  This language made the contract of limited duration.  In *Delta Services & Equipment, Inc. v. Ryko Manufacturing Co.*, 908 F.2d 7, 12 (5th Cir. 1990), the language authorized termination for failure to meet a minimum sales volume requirement.  The Fifth Circuit treated this language as "limited grounds for immediate termination" and not "unequivocal language" necessary to transform the contract into one of definite duration.  Judge Padova found the language in *D&M Sales Inc.* more similar to that of *Delta Services* than that of *Bachman*.

Shuster's sued Peachtree for breach of contract and Peachtree demurred arguing the agreement was terminable at will because it did not contain a durational term or prescribed conditions of termination. *Id.* at *4. The court agreed, finding the agreement lacked a definite duration and conditions of termination. *Id.* at *9. Further, the court stated "[t]his conclusion is not changed even though Peachtree and Schuster agreed upon other terms and conditions; [or] Peachtree and Shuster *expressed a wish that the relationship be long-term* . . . ." *Id.* (alteration and emphasis added). It is axiomatic businesses entering into a mutually beneficial relationship wish for it to be long-term, but this is not sufficient evidence to overcome the presumption of termination at will.

Since viewing the record in the light most favorable to RTG yields no genuine issue of material fact regarding the at-will nature of the Agreement, we find any Agreement between the parties to be have been terminable at will.

### *Curwood may have breached its promise to "protect" RTG before termination.*

We cannot grant summary judgment on all aspects of RTG's breach of contract claim. Finding the Agreement to be terminable at-will does not end our analysis.   The parties have not adduced evidence as to when the Agreement terminated.   While RTG cannot claim breach of contract in perpetuity, it may obtain damages if Curwood's contacts with "protected" customers at some point before the undefined termination date breached the promise to "protect" RTG's contracts and caused damages.   As the parties did not argue this issue and we find no evidence at summary judgment, the jury will need to determine this date.

Curwood asserts only "the undisputed facts show that any agreement between Curwood and RTG had been terminated when Plaintiff alleges the breach took place."   Pennsylvania requires termination of a contract to be "clear and unambiguous."   *Mextel, Inc v. Air-Shields,*

*Inc.*, No. 01-7308, 2005 WL 226112, *19 (E.D. Pa. Jan. 31, 2005) (quoting *Maloney v. Madrid Motor Corp.*, 122 A.2d 694, 696 (Pa. 1956)). "[W]here the conduct of one having the right to terminate is ambiguous, he will be deemed not to have terminated the contract." *Maloney*, 122 A.2d at 696 (citations omitted). The only citation is to RTG's testimony the relationship broke down in 2013. (ECF Doc. No. 43-2, at 7.) This "2013" reference is not specific enough. Curwood provided no additional evidence it actually terminated any agreement it had with RTG prior to selling to RTG customers.

Further, Curwood's conduct regarding the Aramark relationship is, at best, ambiguous. Curwood agreed to sell directly to Aramark in an agreement effective May 1, 2013. For some reason, about two weeks later, it told RTG it preferred to sell trays to Aramark through RTG. The present facts are unclear as to termination in light of Curwood's May 13, 2013 communication to RTG. (A. at 391-93, 507.)

RTG summarily concludes "as shown above, there is substantial evidence that the contracts were not terminable at will, and indeed were not terminated at all." Again, RTG fails to cite evidence supporting this assertion and in fact does not, in its prior argument, discuss the issue of the contracts not being terminated.

### What does the "protect" promise mean?

Once the jury determines when, if ever, the parties unambiguously terminated their Agreement as they may do at any time, it must then determine whether Curwood breached a promise to "protect" the customer relationships.[11]

---

[11]    RTG obliquely refers to other customers possibly contacted by competitor Oliver using Curwood trays and undercutting RTG on price. (A. at 493.) RTG does not adduce any evidence other than its speculation customers may be leaving it for Oliver and notifying Curwood of these issues. While this speculation may not create loss arising from a breach of contract, it does

Both parties used the term "protect" in their July 18-19, 2011 Agreement.   The term is not defined in the emails.  The term "protected" is ambiguous.  We cannot interpret "protected", as a matter of law, with only one meaning.  For example, "protect" could prohibit (1) non-solicitation of the customer, (2) non-disclosure of the customer, (3) no sales to the customer unless through RTG or (4) not competing with other suppliers in selling any product to the identified customer.   As such, this term is ambiguous as there are at least two reasonable alternative interpretations. *Synthes, Inc. v. Emerge Medical, Inc.*, 25 F.Supp.3d 617, 679 (E.D.Pa. 2014)(citing *Stendardo v. Fed. Nat'l Mortg.Ass'n,* 991 F.2d 1089, 1094 (3d Cir. 1993)).   As we find the term "protect" ambigious, we leave the interpretation of "protect" to the jury.  *Synthes, Inc.*, 25 F.Supp.3d at 680 (citing *Hullett*, 38 F.3d at 111).

Accordingly, we find too many issues of fact exist to enter summary judgment in favor of Curwood on the breach of contract claim, although we find either party could terminate the agreement at will.   Summary judgment is therefore granted in part and denied in part with regard to this claim.[12]

### B.   RTG's Good Faith and Fair Dealing claim is subsumed by its breach of contract claim.

"In Pennsylvania a claim predicated on a breach of the covenant of good faith is 'subsumed in a breach of contract claim.' " *Tuno v. NWC Warranty Corp.*, 552 F. App'x 140, 144 (3d Cir. 2014) (quoting *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013) (quotation omitted).  "Therefore, in practice, the covenant of good faith functions 'as an interpretive tool' to aid the court in evaluating breach of contract claims but the implied duty is never 'divorced from

---

indicate RTG's understanding of "protect" : "…should not have to be competing with someone offering the same product."  (*Id.*)

[12]    We also deny summary judgment dismissing RTG's lost profits claim on this aspect of the breach of contract.  In an Order on a motion *in limine*, we limit RTG's potential lost profits.

specific clauses of the contract.' " *Id.* (quoting *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir.2000)).

RTG may not sustain an independent cause of action for breach of the covenant of good faith and fair dealing but, to the extent the breach of contract claim is presented to the jury, RTG may argue Curwood breached an implied covenant of good faith and fair dealing attendant to every contract.  *See Burton*, 707 F.3d at 432 (finding the duty to deal in good faith "does not create independent substantive rights").

### C. RTG's Unjust Enrichment claim fails because RTG benefitted from its relationship with Curwood.

An unjust enrichment claim cannot be sustained where a valid enforceable contract exists between the parties.  *See Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987); *Southeastern Penn. Transp. Auth. v. Gilead Sciences, Inc.*, —F. Supp. 3d—, No. 14-6978, 2015 WL 1963588, *11 (E.D. Pa. May 4, 2015).  A plaintiff may plead unjust enrichment in the alternative to its breach of contract claim, as RTG has done here.  *AmerisourceBergen Drug Corp. v. Allscripts Healthcare, LLC*, No. 10-6087, 2011 WL 3241356, *3 (E.D. Pa. July 29, 2011).  At the summary judgment stage we have not made a final decision as to whether a valid contract existed between the parties, and the parties have not asked us to do so.  In our preceding analysis we assumed without deciding, the Agreement constituted a valid contract.  If the Agreement constituted a valid contract, RTG's unjust enrichment claim is barred.  We find, even if no contract existed, RTG's claim fails substantively and summary judgment is warranted in Curwood's favor on this unjust enrichment claim.

"Under Pennsylvania law, unjust enrichment is an equitable doctrine providing a remedy when (1) one party confers a benefit on the recipient, (2) the recipient appreciates that benefit, and (3) the recipient accepts and retains the benefit under such circumstances that it would be

inequitable or unjust for the recipient to retain the benefit without payment." *Gilead Sciences*, 2015 WL 1963588, *11 (citation omitted).

Curwood argues RTG cannot sustain an unjust enrichment claim because it undoubtedly received a benefit from the Agreement. (ECF Doc. No. 43-2, at 17-18.) It relies on *Power Curbers* involving a similar factual scenario where Judge Pollak granted judgment in favor of the manufacturer on the distributor's *quantum meruit* claim and our Court of Appeals affirmed. 117 F. App'x at 176. There, the distributor argued the manufacturer "effectively appropriated" any good will which the distributor had created in the market place through its advertising and marketing. *Id.* Judge Pollak dismissed such a claim and the Court of Appeals affirmed, finding it was in the distributor's best interests to be a successful marketer for the manufacturer and 'unjust enrichment will not be found where Plaintiff rendered services to advance its own interests.' " *Id.* (quoting *King of Prussia Equip. Co. v. Power Curbers, Inc.*, 158 F. Supp. 2d 463, 467 (E.D. Pa. 2001)).

RTG does not rebut this argument and seemingly concedes it cannot sustain an unjust enrichment claim. *Walker v. Centocor Ortho Biotech, Inc.*, No. 11-4917, 2013 WL 664204, *4 (E.D. Pa. Feb. 25, 2013) ("Where an issue of fact or law is raised in an opening brief, but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant." (internal quotations omitted)).

We find Curwood's argument persuasive. As a distributor, new to the tray distribution industry, RTG sought to effectively market the trays manufactured by Curwood to obtain end customers. While Curwood benefitted from RTG's Distributor Lead Forms, RTG also profited from securing multiple customers and selling Curwood's trays in large quantities. (A. at 36.); *Norris Sales Co., Inc. v. Target Div. of Diamant Boart, Inc.*, No. 01-6793, 2002 WL 31771169,

*4 (E.D. Pa. Dec. 11, 2002) (granting summary judgment on unjust enrichment claim where distributor profited from selling defendant manufacturer's products).   Accordingly, we grant summary judgment in favor of Curwood on RTG's unjust enrichment claim.

> ### D. RTG's promissory estoppel claim fails as a matter of law because RTG cannot establish it relied on any promise by Curwood or that any such reliance was reasonable.

As with unjust enrichment, a claim for promissory estoppel cannot survive in the face of a valid enforceable contract.  *Wilson v. Bank of America*, 48 F. Supp. 3d 787, 814 (E.D. Pa. 2014).   "Under Pennsylvania law, a court may enforce a 'promise that is unsupported by consideration where (1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promisee, (2) the promise does induce action or forbearance by the promisee, (3) and injustice can only be avoided by enforcing the promise.' "  *Ankerstjerne v. Schlumberger, Ltd.*, 155 F. App'x 48, 51 (3d Cir. 2005) (quoting *Carlson v. Arnot-Ogden Mem'l Hosp.,* 918 F.2d 411, 416 (3d Cir.1990)).   Reasonable reliance is a requirement of promissory estoppel.  *Josephs v. Pizza Hut of Am., Inc.,* 733 F. Supp. 222, 226 (W.D. Pa. 1989).

Curwood argues RTG fails to show any reasonable act in reliance upon a Curwood promise.  (ECF Doc. No. 43-2, at 10-13.)  Curwood focuses on RTG's decision to build an 8,000 square foot warehouse to house trays arguing it could not reasonably foresee such construction when it agreed to give RTG "protection" on various accounts as the relationship between the parties began only months before RTG undertook construction of the warehouse and almost all shipments of trays went directly from Curwood to Aramark rather than to RTG.  (*Id.* at 12.)  This relationship marked RTG's first foray into the tray distribution industry.  (*Id.*)  Building an 8,000 square foot warehouse, months after starting a new business line and forming a new relationship is a considerable business risk rather than a reasonably reliant one.  (*Id.* at 12-13 (citing *Nat'l*

*Controls Corp. v. Nat'l Semiconductor Corp.*, 833 F.2d 491, 499-500 (3d Cir. 1987), and *Burton Imaging Grp. v. Toys "R" Us, Inc.*, 502 F. Supp. 2d 434, 439 (E.D. Pa. 2007)).

RTG argues a genuine issue of material fact remains regarding the reasonableness of its actions. (ECF Doc. No. 58, at 22-23.) It alleges Curwood promised to protect various accounts and RTG took reasonable actions in reliance upon that promise. RTG argues Curwood knew RTG was building the additional warehouse to accommodate the tray business and did not tell RTG to stop. (*Id.* at 23.) However, RTG does not challenge any of the arguments made by Curwood and fails to point to record evidence supporting the reasonableness of its reliance or that it even relied on any promise by Curwood.

While reasonableness of a party's reliance is generally a question of fact reserved for the jury, "if there are no genuine disputes of material fact on the issue of reasonable reliance, it may be decided as a matter of law by the court." *Johnson v. Dunkin' Donuts Franchising LLC*, No. 11-1117, 2014 WL 2931379, *21 (W.D. Pa. June 30, 2014) (citing *Massaro Ltd. P'ship v. Baker & Taylor, Inc.*, 161 F. App'x 185, 189 (3d Cir. 2005)). Here, we find no genuine issue of material fact on the issue of reasonable reliance preventing the entry of summary judgment in favor of Curwood.

RTG founder Robert Cheatle testified RTG began to build the additional 8,000 square foot warehouse in January 2012 out of "necessity." (A. at 35.) RTG began construction since it had "trays stacked throughout my entire existing building that was causing inconvenience . . . ." (*Id.*) Further, Robert Cheatle testified RTG's business plan required it to "keep in the forecast six to eight truckloads of Curwood trays available for immediate delivery to customers." (*Id.* at 26.) When asked who informed him of such an estimate, he replied "my sales manager." (*Id.* at 26-27.) As a result of this "necessity" created by an internal sales estimate not disclosed to

Curwood, RTG made the "quick decision" to build the additional warehouse space.  (*Id.* at 35, 156.)

"Under Pennsylvania law, the promisor must have an objectively reasonable belief that a purported promise will induce action by the promisee."  *Burton*, 502 F. Supp. 2d at 439.  This element is not established where action is induced the promisee's "mistaken judgement" because such reliance is not reasonable.  *Id.* (citing *Murphy v. Bradley*, 537 A.2d 917, 919 (Pa. Commw. Ct. 1988)).

RTG adduces no evidence of reasonable reliance on Curwood's "protected" promise. Instead, the record confirms RTG's decided to invest $700,000 for a warehouse  based solely on its judgment regarding the amount of trays needed to service its customers.  *Josephs,* 733 F. Supp. at 227 ("There can be no estoppel when the plaintiffs' actions were the result of their own will and judgment rather than the product of defendants' agent's representations.).  A party cannot claim reasonable reliance where it relies "solely on its own judgment in determining the legal effect of a promise."  *Burton*, 502 F. Supp. 2d at 439-40 (citation omitted).  RTG believed Curwood's "protected" promise granted it the right to the exclusive distribution of Curwood trays to various companies for a perpetual duration.  Relying on this conclusion to then invest hundreds of thousands of dollars is unreasonable as a matter of law.  *Id.* at 440.  Summary judgment is granted in favor of Curwood on the promissory estoppel claim.

### E.     RTG's tortious interference claims are barred by the gist of the action doctrine.

RTG brings two claims of tortious interference: 1) intentional interference with contractual relations and 2) intentional interference with prospective contractual relations.  (ECF Doc. No. 1, Compl., ¶¶ 97-117.)  Curwood argues these claims are barred by the gist of the action because the "allegations RTG uses to support its tort claims are identical to those

underlying the contract claim." (ECF Doc. No. 43-2, at 13.) Curwood argues any obligation to refrain from selling to "protected" customers emanates from the Agreement's obligation to "protect" these accounts. Thus, these causes of action sound in contract rather than tort and barred by the doctrine. (*Id.* at 13-14.)

"Generally, the doctrine is designed to maintain the conceptual distinction between breach of contract claims and tort claims."[13]  *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002). To avoid application of the doctrine, "the [tortious] wrong ascribed to the defendant must be the gist of the action with the contract being collateral . . . ." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 103-04 (3d Cir. 2001) (citing *Redevelopment Auth. of Cambria Cnty v. Int'l Ins. Co.*, 685 A.2d 581, 590 (Pa. 1996) (en banc)). "The important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." *Redevelopment Auth.*, 685 A.2d at 590. Therefore, the Court cannot limit its inquiry into discrete instances of conduct "rather, the test is, by its own terms, concerned with the nature of the action as a whole." *American Guar. & Liab. Ins. Co. v. Fojanini*, 90 F. Supp. 2d 615, 622-23 (E.D. Pa. 2000).

Curwood relies on *Chemtech Int'l, Inc. v. Chemical Injection Technical, Inc.*, 170 F. App'x 805, 809 (3d Cir. 2006). Our Court of Appeals affirmed the district court's dismissal of the tortious interference claims pursuant to the gist of the action doctrine. *Chemtech Int'l*, 170 F. App'x at 808-09. Plaintiff Chemtech Int'l ("Chemtech") contracted with Defendant Chemtech Injection Technical ("CIT") to be the exclusive distributor of CIT's gas chlorination systems. *Id.*

---

[13]    "The Pennsylvania Supreme Court has not expressly adopted the gist of the action doctrine though both our Court of Appeals and the Pennsylvania Superior Court have predicted it would do so." *Vives v. Rodriguez*, 849 F. Supp. 2d 507, 517 (E.D. Pa. 2012) (quoting *PPG Indus., Inc. v. Generon IGS, Inc.*, 760 F. Supp. 2d 520, 527 n.1 (W.D. Pa. 2011)).

at 806.   CIT terminated the relationship and Chemtech sued CIT claiming it had been dealing

directly with sub-distributors and Chemtech's customers in breach of their agreement.  *Id.*at 806-

07, 809.   Our Court of Appeals affirmed the dismissal finding "Chemtech does not have a right

to be free from competition and CIT has no duty 'imposed by law as a matter of social policy'

not to compete with Chemtech.   Only a contract can confer such a right . . . ."  *Id.* at 809.

Because the right to be free from competition can only be imposed by contract, the claimed

misconduct violated contractual obligations rather than creating torts.  *Id.*

RTG suffers the same fate as Chemtech with regard to its tortious interference claims.   Its

complaints are similar to *Chemtech*.   RTG accuses Curwood of violating the "protected"

language and dealing directly with RTG"s customers.   Absent the Agreement and the

"protection" given by Curwood, RTG did not have a right to be free from Curwood's

competition.   RTG characterizes its own allegation as one of "unfair[] compet[ition]."  (ECF Doc

No. 58, at 21.)    Just as in *Chemtech*, this is a duty imposed by contract and as such the gist of

the action is contractual in nature rather than tort.

RTG provides no compelling reason for a contrary conclusion.   It argues "a jury could

reasonably determine that Defendant's tortious interference with RTG"s contracts was separate

and apart from the Defendant's breach of contract."  (*Id.* at 20.)   RTG cites no record evidence.

It further argues a reasonable jury could find Curwood did not breach the Agreement but did

interfere with RTG's contractual relations.   (*Id.*)   We fail to see the legal significance of this

argument as the two claims are not necessarily dependent on each other.   *See Chemtech*, 170 F.

App'x at 809 (noting plaintiff can fail to state both claims at once).   Whether the gist of the

action doctrine applies is a question of law.  *Bohler-Uddeholm*, 247 F.3d at 103.   Because RTG's

tortious interference claims are "intertwined with contractual obligations," we find, as a matter of

law, the gist of this action is contractual and the tortious interference claims are barred.  *Id.* at 103-04.

### F.     RTG's fraudulent misrepresentation claim is also barred by the gist of the action.

RTG also brings a claim for fraudulent misrepresentation, which it characterizes as fraudulent inducement.  (ECF Doc. No. 58, at 11.)  Curwood argues this tort claim is also barred by the gist of the action as amounting to nothing more than an attempt to recast its breach of contract claim.  (ECF Doc. NO. 43-2, at 15-16)  According to Curwood, a fraudulent inducement claim based on misrepresentation as to a party's intent to perform under the contract is barred by the gist of the action.  (*Id.*)  Likewise, any claim where a party stated it would adhere to the contract and then failed to do so is barred under the doctrine.  (*Id.*)  Accordingly, it is "unavoidably intertwined" with the breach of contract claim and barred.  (*Id.* at 16.)

RTG responds the gist of the action doctrine does not apply under Pennsylvania law:  1) to fraudulent inducement claims; and 2) where a defendant takes affirmative steps to conceal the breach in order to deceive the plaintiff.[14]  (ECF Doc. No. 58, at 11-19.)

### *Fraudulent inducement of the July 18-19, 2011 relationship is barred.*

RTG's first argument is not categorically correct.  It is true some courts have found fraudulent inducement claims are "much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists.  However, it is equally the case . . . that [w]here the precontractual statements that are the basis for the

---

[14]     RTG also argues Curwood's state of mind in providing the "protected" language on July 19, 2011.  (ECF Doc. No. 58, at 11-12.)  The argument, such as it is, claims Curwood's agent's state of mind when he provided the "protected" language is a question of fact for the jury.  And since a reasonable jury could find Curwood's "[s]tatements of intention" did not represent his "true state of mind," summary judgment should be denied.  (*Id.*)  However, we are not deciding the merits of RTG's fraud claim but rather evaluating the true nature of the claim so as to decide whether the gist of the action doctrine applies.

fraudulent inducement claim concern specific duties that the parties later outlined in the alleged contract, courts have repeatedly dismissed such claims as sounding in contract and, thus, barred by the gist of the action doctrine." *Wen v. Willis*, —F. Supp. 3d—, No. 15-1328, 2015 WL 4611903, *5 (E.D. Pa. July 31, 2015) (comparing cases addressing gist of the action applied to fraudulent inducement claims) (internal quotations and citation omitted); *see also Morrison v. AccuWeather, Inc.*, No. 14-0209, 2015 WL 4357346, *4-5 (M.D. Pa. July 14, 2015) (performing similar analysis). " '[T]he particular theory of fraud—whether it lies in inducement or performance—is not dispositive . . . .' " *Vives*, 849 F. Supp. 2d at 519 (quoting *Guy Chemical Co. v. Romaco N.V.*, No. 06-96, 2007 WL 184782, *6 (W.D. Pa. Jan. 22, 2007)). Thus, we must engage in "fact-intensive judgment as to the true nature of a claim." *See Williams v. Hilton Grp. PLC*, 93 F. App'x 384, 385 (3d Cir 2004); *see also Integrated Waste Solutions, Inc. v. Goverdhanam*, No. 10-2155, 2010 WL 4910176, **9-12 (E.D. Pa. Nov. 30, 2010).

We find this case falls into the latter category where any misrepresentations are later incorporated into the contract. RTG's fraud claim expressly focuses on the "protected" language in the July 18-19, 2011 emails. (ECF Doc. No. 1, Compl., ¶ 119 ("Curwood represented to RTG that, among other things, the would protect RTG on any account, for which a Distributor Lead Form was submitted to and approved by Curwood.")). Ultimately, the "application of the doctrine 'should turn on the question of whether the fraud concerned the performance of contractual duties . . . .'" *Vives*, 849 F. Supp. 2d at 520-21.

There is no bright line rule. We find RTG's fraudulent inducement claim based on any misrepresentation by Curwood regarding its intent to perform consistently with the "protected" language is barred as the gist of the action is contractual in nature. *Id.* at 522.

### *RTG's allegations regarding Curwood's fraud in Spring 2013 do not rise to the level of Synthes.*

RTG argues Curwood concealed its true intent to breach the Agreement in Spring 2013 causing it damages under a concealment theory recently evaluated in *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617 (E.D. Pa. 2014) and *Orthovita Inc. v. Erbe*, No. 07-2395, 2008 WL 423446 (E.D. Pa. Feb. 14, 2008).

RTG argues Curwood took affirmative steps to conceal its breach of contract from RTG, "and that this concealment misled RTG into continuing on with the contractual relationship instead of asserting its rights against Defendant to not sell to protected accounts." (ECF Doc. No. 58, at 12.) Curwood's alleged acts include:

> (a) Meeting in secret with Aramark officials beginning in October, 2012 for the sole purpose of pursuing an agreement whereby Curwood would sell trays directly to Aramark by cutting RTG out of the distribution process;
>
> (b) Continuing said meetings in secret over the course of a seven-month period during which Curwood was negotiating with Aramark to cut RTG out of the distribution process;
>
> . . .
>
> (f) Falsely claiming that Aramark did not want to work with RTG because of vague and unexplained 'service issues' and relationship issues
>
> . . .
>
> (h) Never informing RTG of alleged service issues with Aramark until after Curwood had already taken the business away from RTG by signing a direct distribution agreement with Aramark.

(*Id.* at 12-13 (internal citations omitted)).

Despite RTG's contention the "case at bar is strikingly similar" to *Synthes* and *Orthovita,* we find the facts here are widely different and these cases inapposite. In *Synthes*, an employee endeavored to form a competing company while still working for Synthes. In doing so, the employee allegedly misrepresented his compliance with his fiduciary and contractual obligations

to Synthes.  Further, the employee misrepresented his intention to compete with Synthes all the while stealing proprietary Synthes information to use in his new company.  Moreover, the employee allegedly fraudulently concealed or failed to preserve physical and electronic documents relating to the claims at issue in the case.   Judge Buckwalter denied summary judgment on Synthes' fraud claim because these instances of concealment and fraud fell outside of any contractual agreements between Synthes and the employee.  *Synthes*, 25 F. Supp. 3d at 723-27.

In *Orthovita*, a corporate officer planned his leaving and forming a new company while under multiple non-compete, assignment, and confidentiality contracts with his employer.  2008 WL 423446, at *2-3.  The employee failed to inform his employer of his plans and in fact took affirmative steps to hide his tracks.  The employee tried to hide his copying of computer files by deleting more than 5,500 files from his company laptop and transferring information to non-traceable flash drives.  *Id.* at *3.  After confrontation, the employee expressed his loyalty to his employer, which resulted in the company not terminating his employment and allowing him to participate in meetings concerning business strategy.  *Id.* at *8.  The court refused to bar the claim under the gist of the action doctrine because the former employee's misrepresentations resulted in continuing access to proprietary information, which could be "analytically separate from the breach of the contract claim itself."  *Id.*

Unlike *Synthes* and *Orthovita*, RTG cannot adduce evidence of fraudulent activity occurring outside of the Agreement.  No evidence details misrepresentations made by Curwood to RTG intended to deceive RTG into continuing with the Agreement to its detriment or failing to assert their contractual rights.  Instead, the evidence shows RTG continued to profit from the

26

Agreement.  RTG adduces no evidence of any damages resulting from Curwood's curious, and possibly misleading, May 13, 2013 email regarding future work with Aramark.

Further, unlike *Synthes* and *Orthovita*, RTG cites no evidence Curwood took steps to conceal its dealings with Aramark.  Curwood did not misappropriate RTG proprietary information to obtain the Aramark account nor did Curwood misrepresent its intention at any point during the relationship between the parties.  In the May 13, 2013 email, Curwood disclosed Aramark approached it to quote directly and it would rather address Aramark's concerns than lose the business to a competitor since Aramark allegedly did not want to deal with RTG.  (A. at 507.)  Moreover, unlike the employees in *Synthes* and *Orthovita*, who were bound by employment and loyalty agreements which they breached, Curwood owed no duty to inform RTG of its business dealings.  Accordingly, we grant summary judgment in favor of Curwood on the fraud claim as barred by the gist of the action.

## III.   CONCLUSION

We find the Agreement is terminable at will.  At this stage, we do not know when the parties terminated the Agreement or how to interpret "protected" as an obligation imposed during the term of the Agreement.   We cannot grant summary judgment dismissing RTG's breach of contract claim as there are factual issues including when, if ever, the parties terminated the Agreement and the meaning of "protected."   RTG's claims of unjust enrichment and promissory estoppel fail as RTG benefited from its relationship with Curwood, and RTG fails to show an issue of fact challenging the patent unreasonableness of its reliance on Curwood's "protected" promise.  As to the tort claims, the gist of the action doctrine bars RTG's tortious interference claims as they are essentially contractual in nature and the fraudulent misrepresentation claim is contractual and RTG does not cite evidence of an intent to deceive

RTG into continuing with the Agreement or failing to assert its contractual rights.  The parties shall proceed to trial on RTG's limited breach of contract claim and Curwood's counterclaims, on which RTG did not move for summary judgment.