IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERTS TECHNOLOGY GROUP, INC. | : CIVIL ACTION :  :  |
| v. | : :  : NO. 14-5677 |
| CURWOOD, INC. | : |

**KEARNEY, J.**                                                                                   **January 27, 2016**

## MEMORANDUM

A business winning a jury verdict on a breach of contract claim is entitled to be compensated to the extent it would have benefited but not rewarded with more than it could expect absent the breach. At most, the winning business can recover its net profits, if any. It cannot seek damages based on only one side of the income statement with gross profits and disregard its expected costs necessary to generate these profits. To this end, the business winning a breach of contract claim must produce a quantum of evidence at trial to allow the jury to find net lost profits with reasonable certainty. The jury cannot speculate as to the costs of production and guess at the net profits. With the benefit of extended time for a searching analysis of the trial record, and with the necessary deference to the role of jurors as constitutional officers, we must find the Plaintiff business failed to provide more than a mere scintilla of evidence regarding net profits. We accordingly grant Defendant's post-trial motion in part and require a new trial on damages sought by Plaintiff alone under question IA of the verdict sheet.

I.  BACKGROUND

A distributor of food trays and covering film, Roberts Technology Group, Inc. ("RTG"), sued its former tray and film supplier Defendant Curwood, Inc. ("Curwood") alleging breach of contract, intentional interference with contractual relations, unjust enrichment, and promissory estoppel.[1] RTG claimed compensatory damages in excess of $10,000,000.[2] Curwood counterclaimed for billed costs which RTG conceded setoff any recovery.

Curwood moved for summary judgment on all claims. We granted its motion in part and denied it in part.[3] We granted summary judgment on six of RTG's seven counts with the breach of contract claim the lone remaining claim.[4] We found issues of fact prevented us from granting summary judgment on RTG's breach of contract claim but held the contract, as it existed, was terminable at-will by either party. Thus, the parties proceeded to the jury on RTG's breach of contract claim, as well as Curwood's counterclaims for fees owed to it on a supply contract.

On October 30, 2015, the Court commenced a three-day trial. At the close of RTG's case-in-chief, Curwood moved for judgment as a matter of law under Fed.R.Civ.P. 50(a) on three grounds: (1) RTG did not prove any lost film sales as damages; (2) RTG failed to offer sufficient evidence with regard to net lost profits as opposed to gross lost profits; and (3) the evidence showed RTG failed to mitigate its damages.[5] We denied Curwood's motion in its entirety subject to renewal.[6] On November 3, 2015, the jury returned a verdict in favor of RTG finding, on question IA, Curwood breached a contract with RTG and on question IB, awarding $3,000,000 in compensatory damages for breach of contract found in question IA.[7] The jury also returned a verdict of $83,880.42 in favor of Curwood on its breach of contract counterclaim.[8] On December 2, 2015, Curwood moved for judgment as a matter of law, or in the alternative, for modification of judgment, under Fed.R.Civ.P. 50(b) and 59.

## II. CONTENTIONS AND STANDARD OF REVIEW

Curwood primarily argues RTG did not adduce sufficient evidence for a jury to determine net lost profits, as opposed to gross lost profits, to a reasonable degree of certainty.[9] In the same vein, Curwood argues RTG did not adduce sufficient evidence for a jury to determine net lost profits with regards to "protected accounts" other than Aramark or as to film sales.[10] Additionally, Curwood argues the evidence at trial shows RTG failed to mitigate its damages.[11] In the alternative, Curwood moves for remittitur on the grounds any award of lost profits for sales to accounts other than Aramark, as well as film sales, could not have been supported by any evidence.[12]

After a party has been heard at trial a court may grant a motion for judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[13] A court may grant the motion only if "the record is critically deficient of the minimum quantum of evidence to sustain the verdict."[14] While judgment as a matter of law should be granted sparingly, a "scintilla of evidence" is insufficient to sustain a jury's verdict.[15] We must "view the evidence in the light most favorable to the non-moving party" and avoid "weigh[ing] the evidence, determin[ing] the credibility of witnesses, or substitute[ing] [our] version of the fact's for the jury's version."[16] We may only grant the Rule 50 motion "if upon review of the record it can be said as a matter of law that the verdict is not supported by legally sufficient evidence."[17]

## III. ANALYSIS

### A.   Waiver

"'[A] defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiffs on notice waives the defendant's right to raise the issue in their

3

Rule 50(b) motion.'"[18] RTG argues Curwood is attempting to improperly "shoehorn" arguments not raised at the Rule 50(a) stage into its current motion.[19]

Curwood's reply brief states its renewed motion only concerns: (1) the evidence was insufficient to determine net lost profits; and (2) RTG failed to mitigate its damages.[20] To the extent Curwood's renewed motion raises arguments outside of those two issues, we agree with RTG and consider them waived. Our analysis will not address any unrelated issues.

### B.   Gross profits versus net profits.

Curwood's primary argument in its renewed motion is relatively straight forward but our analysis requires examining the trial transcript with a fine-toothed comb. Curwood contends RTG failed to present any evidence of costs associated with its tray distribution business to educate the jury's finding of lost net profits with reasonable certainty. Curwood argues RTG only presented evidence of its gross lost profits, requiring the jury to speculate as to costs and rendering the jury's award of damages unsustainable.

"Generally, under Pennsylvania law, damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences."[21] That mathematical certainty is not required does not relieve a plaintiff from introducing sufficient facts "so that the court can arrive at an intelligent estimate without conjecture."[22] Thus, "it is only required that the proof afford a reasonable basis from which the fact-finder can calculate the plaintiff's loss."[23]

Pennsylvania law allows parties to recover loss of profits in contract.[24] Further, it is equally beyond doubt the proper measure of lost profits is net profits, not gross.[25] "Net profits are defined as gross revenue less fixed costs, and less variable costs pegged to the number of units sold."[26] A party wishing to establish net lost profits must provide evidence "concerning the factors essential to establish net profit as opposed to gross profit."[27]

4

Lost profits must be proven to a "reasonable certainty."[28] "At a minimum reasonable certainty embraces a rough calculation that is not too speculative, vague, or contingent upon some unknown factor."[29] "[M]ere uncertainty to the amount of damages does not require us to enter judgment as a matter of law" because lost profits need not be established with any "mathematical certainty."[30] "The recovery of lost profits 'pits the plaintiff's right to the bargain of his contract against the need to prevent jury verdicts based on speculation rather than proper proof.'"[31]

We must determine whether RTG presented the minimum quantum of evidence to establish the essential elements of net profits to reasonable degree of certainty

i. *Michael Cheatle's trial testimony.*

Michael Cheatle works in RTG's sales department. He testified in large part concerning his interpretation of the "protection language" at the heart of this contract dispute and described in our September 23, 2015 summary judgment memorandum. He refers to costs RTG incurred in marketing the trays bought from Curwood.[32] He found "protection" from Curwood to be important because:

> I had a lot of time invested. We did a lot of trade shows across the country, [e]very region of the country. Meals on Wheels shows, correctional shows, everything. So just the investment that we made, the time and financially, I needed that.[33]

Michael Cheatle explained the "time and effort" he spent developing RTG's customers:

> So, I would fly around the country, of course, marketing my—my trays, film, and machinery, my one-stop shop solution, and then I would attend all these trade shows where I would build relationships with each and every one of these customers and I'd gain their trust and, eventually, hopefully, after it would develop and financially they can afford my system from the get-go, we can pursue a business relationship.[34]

5

Michael Cheatle described the cost of promoting the Curwood trays to potential customers.[35] In an email to Paul Vanden Heuvel at Curwood detailing RTG's semi-annual newsletter, Michael Cheatle stated, "[m]aking these newsletters are very costly so we want your opinion before we proceed."[36] Moreover, when asked by RTG's counsel whether RTG went ahead and spent its money to market the Curwood trays, Michael Cheatle responded, "Absolutely."[37]

Michael Cheatle's testimony unequivocally demonstrates RTG had some costs associated with selling the trays supplied by Curwood to RTG's customers. RTG argues Michael Cheatle's testimony allows a jury to reasonably estimate the total costs from which it could calculate net lost profits.[38] RTG cites *Mountbatten Surety Co. v. AFNY, Inc.* in support of this proposition.[39] In *Mountbatten*, Judge Dalzell denied summary judgment on damages relating to the defendant's counterclaims because of sufficient disputed evidence requiring a trial.[40] Judge Dalzell found the defendant's financial statements constituted sufficient evidence from which a jury could reasonably determine net profits.[41] The financial statements included not only gross commissions but also net profits and a jury could "come to a conclusion on net profit loss."[42] Contrarily, Michael Cheatle offered no numbers or financial information from which a jury could extrapolate figures to reach a net lost profits figure. The only evidence relating to an actual damages figure comes from John Maloney, an expert accountant.

### ii. *John Maloney's trial testimony*

RTG offered John Maloney as its damages expert.[43] Mr. Maloney testified to the calculations performed in his expert report and provided his calculated damages for tray sales and film sales. Curwood argues Mr. Maloney failed to present any opinions at trial on RTG's net lost profits as opposed to their gross lost profits.

6

Mr. Maloney described the calculations resulting in his damages estimate.[44] Essentially, Mr. Maloney, through his review of invoices and interviews with RTG personnel, calculated the estimated number of trays RTG would have sold.[45] He then multiplied the total number of trays estimated to be sold by the average price sold—$0.129 for Aramark and $0.16 for the "other protected accounts."[46] His mathematical calculation resulted in the total sales for an identified RTG present or potential account. Mr. Maloney then calculated the "gross margin" on all estimated tray sales.[47] Mr. Maloney testified he "made a determination, what are they selling it for and at what gross margin are they selling it for in order to determine what their net profit was."[48] In other words, the gross margin represented the difference between the price at which RTG bought the trays from Curwood and the price at which it sold the trays to Aramark and the other accounts. He did not account for any other costs of production.

RTG argues Mr. Maloney's calculations "properly included any avoided costs." We find, upon combing the transcript, the evidence shows Mr. Maloney in no way attempted to include any avoided costs. On direct testimony Mr. Maloney admitted his calculation solely took into consideration the price paid to Curwood, the price charged by RTG, and the total number of trays estimated to be sold.[49] For example, he described profits from lost customer Aramark:

> So I took 7.7 million times 12.9 cents and I took that number and multiplied it by 14 percent. So that was the percentage in which they were actually making on each Aramark sale . . . I did the same thing for film sales.[50]

He testified consistently as to his process for determining gross lost profits with regard to the other protected accounts:

> The number of trays times sixteen cents is what they were selling it for. Again, they were selling it for a little bit more than they were at Aramark times 35 percent . . . did the same thing for film.[51]

7

The inescapable conclusion drawn from Mr. Maloney's trial testimony—based entirely on his expert report—is his damages calculations do not involve any review of "costs pegged to the number of units sold."[52]

There may be possible explanations for Mr. Maloney not including any costs aside from the cost of goods sold in his calculation. Mr. Maloney testified of his awareness of "a technical determination between gross profit and net profit."[53] But he then testified "[i]t's really one and the same for this purpose." Mr. Maloney testifies he did not account for "salaries needed to generate that revenue," "benefits that would be attributable to generating that revenue," or "expenses that should be backed out to get to the net profits."[54] All of these costs, according to Mr. Maloney, were unnecessary and he did not need to take them into account in his profits calculation.[55]

Another explanation may be his use of a lower gross profit percentage accounts for fixed and variable costs. Mr. Maloney suggested using a lower gross profit margin may take into account these costs. When asked whether he took into account certain client expenses when calculating his damages estimate, Mr. Maloney testified, "Again, I don't have it in my report because it wasn't necessary and I already had used a lower average gross profit margin."[56] RTG pounces on this language to argue the purposeful effect of Mr. Maloney's use of the lower gross profit margin percentage in that it accounts for the costs.[57]   RTG observes Mr. Maloney testified he calculated an average gross margin for tray sales between 36.3% and 43.7% but he used a conservative 35% profit margin instead.[58]   It further cites Mr. Maloney's testimony to argue any reduction in profit margin accounts for costs and the remaining gross profit percentage consequently states the net profit percentage.[59] This argument is untenable given Mr. Maloney's previous testimony on direct examination:

8

> Q: So you used a smaller number than the number that you found to be even reasonable; is that right?
> A: That's correct.
> Q: And so that would produce a smaller number in lost profits; is that right?
> A: That's correct.
> Q: And why did you do that?
> A: Because I thought that was a reasonable number to use. [60]

Mr. Maloney did not answer he believed the lower number represented a percentage which takes into account costs in generating the business. Nor did he even intimate such reasoning. Rather, on cross examination he posits the lower number *possibly* taking into account these costs and if it doesn't actually take into account these costs, we should consider it a trade-off: he did not take costs into account but he used a smaller number so we should disregard his mistake. We cannot disregard this mathematical and legal error.

The law requires a party to set forth the minimum quantum of evidence for a jury to find the net lost profits with reasonable certainty. [61] Mr. Maloney's testimony confirms he did not account for specific production costs in his damages calculation. Any statement by Mr. Maloney to the effect costs were superfluous to any calculation he performed is not supported by his expert report or evidence presented at trial.

### C. Application of net profit testimony.

Given the testimony, we cannot find RTG presented the minimum quantum of evidence necessary for a jury to calculate damages to a reasonable certainty. In *Deaktor*, our Court of Appeals affirmed the district court's refusal to send the issue of damages to the jury as it was "too speculative."[62] The plaintiff failed to adduce evidence of net profit as opposed to gross profit.[63] The plaintiff's sole damages witness testified as to the plaintiff's gross profit.[64] In an attempt to characterize gross and net profit as the same in this situation, the witness testified "net profit would have increased in the same amount of gross profit."[65] However, the court found this

9

"unsupported statement" insufficient to meet the plaintiff's burden.[66] In affirming the district court's judgment as a matter of law, the Court of Appeals found, "[p]laintiffs' failure to produce evidence concerning the factors essential to establish net profit as opposed to gross profit, in effect, meant that the jury would have to speculate as to the amount of damages."[67]

Our Court of Appeals discussed the "essential" factors in measuring lost profits in *Tunis Bros*[68] Applying *Deaktor's* holding the Court again established the ground rules: "the appropriate measure of damages with respect to future lost profits is net profits, not gross."[69] The court then defined net profits as "gross revenue less fixed costs, and less variable costs pegged to the number of units sold."[70] Plaintiff argued "Ford tractor sales did not appreciably increase its fixed overhead expenses; utilities and salaries would have remained the same regardless of additional tractor sales."[71] On cross-examination, the plaintiffs' expert "admitted that the gross profits on any increased tractor sales would be reduced by the whole litany of expenses that a company has other than direct sales."[72] Again, the court had no choice but to find "absent quantification of numerous costs accruing with additional sales, the jury was left to speculate as to the amount of net profits recoverable in compensatory damages."[73]

More recently, our Court of Appeals issued a non-precedential opinion on the measure of net profits in *Levy* where defendants argued for judgment as a matter of law on the issue of damages as plaintiffs failed to produce evidence of costs, an essential element of net lost profits.[74] The Court of Appeals found plaintiffs adduced sufficient evidence to sustain a finding of net lost profits.[75] The evidence presented at trial included purchase orders and internal accounting documents detailing plaintiffs' net profits equaled the sales price appearing on the purchase orders.[76] Further, plaintiff elicited testimony showing "costs and expense associated with selling [the product] were paid upfront or reimbursed . . . and thus, for purposes of

10

calculating net profits, costs and expenses were zero."[77] The court ultimately held the record contained documentary and testimonial evidence demonstrating the sales price on the purchase order reflected costs and expenses, and thus gross income and net profits.[78]

RTG makes many of the same arguments made in *Deaktor* and *Tunis Bros.* In *Tunis Bros.*, the plaintiffs argued gross profits were an appropriate measure of damages because "there would not have been any discernible increased costs in overhead expenses associated with the projected lost tractor sales."[79] Moreover, the only cost increases were "negligible" as "utilities and salaries would have remained the same regardless of additional tractor sales."[80] RTG similarly argues the bulk of its costs were borne up front, and any remaining costs were "zero or minimal."[81] Just as the plaintiffs in *Tunis Bros.*, RTG offers no evidence to this effect other than Mr. Maloney's unsupported statement regarding salaries already being paid. No other witness offered by RTG testified as to any quantification of its costs in obtaining business or generating any future revenue. Unlike *Levy* and *Mountbatten* where the parties offered financial statements, detailed invoices, and direct testimony on the issue, RTG has offered no evidence it took costs into account when calculating damages or present any evidence of the quantification of its costs.

During cross examination of Curwood employee Peter Wright, counsel for RTG read an email from RTG's founder Robert Cheatle expressing dismay regarding a competing distributor contacting RTG customers offering to sell Curwood trays: "[o]ur advertising, marketing, trade shows, sales personnel, travel expenses, and legal fees have exceeded $350,000 to promote your product and new accounts" and he incurred "major expenses out-of pocket . . . ."[82] RTG argues this "clear testimony" demonstrates "all of RTG's expenses up until the date of trial totaled approximately $350,000."[83] Moreover, RTG argues, without record citation, the testimony

11

"established that RTG's expenses going forward would have been far lower than the expenses it had incurred pre-trial."[84]

Contrary to RTG's assertions, this evidence does not establish any relationship between costs already incurred and future costs. In other words, the jury would have to speculate as to the future costs of doing business in the tray industry to arrive at a net lost profits figure. The jury heard no evidence how this number is correlative to RTG's future expenses. We also lack evidence indicating in the slightest this $350,000 figure includes RTG's entire universe of costs or expenses. Accordingly, this single statement is not only "vague" in that it is unclear if these are the only expenses incurred, it is also contingent on some unknown factor, namely, whether all costs will remain the same in the future. RTG's proof represents the "scintilla of evidence" upon which a jury verdict cannot rest. RTG offered no further testimony on this figure and Mr. Maloney did not mention this figure into account when calculating his damages estimate. Thus, we conclude RTG failed to offer the minimum quantum of evidence necessary to allow the jury to reach a net lost profits figure with reasonable certainty. [85]

### D.     Remedy

Federal Rule of Civil Procedure 50(b) provides a court may grant a new trial when ruling on a renewed motion. Fed.R.Civ.P. 50(b)(2). While Curwood did not move for a new trial on damages, it is within our discretion to grant such a remedy if we determine the malady may be cured in a second trial.[86] Because we find the scintilla of damages evidence does not sufficiently support the jury's finding on net lost profit damages, we order a new trial on Plaintiff's damages alone and permit the parties to more fully address RTG's net profits lost in the sales of trays, film and identified accounts as a result of the breach of contract found by the jury.[87]

As we are ordering a new trial on damages we need not reach the issue of remittitur raised in Curwood's renewed motion. Accordingly, Curwood's request for remittitur is denied.

## IV. CONCLUSION

RTG failed to adduce sufficient evidence to support the jury's award on lost net profits owed to it. RTG's expert witness' damages calculations failed to account for any avoided costs by no longer conducting tray sales. No witness adduced the minimum quantum of evidence necessary to sustain the jury's finding of compensatory damages awarded to RTG. As liability is not an issue in front of the Court, we order a new trial on damages owed to RTG. All other findings in our Judgment Order remain in effect.

---

[1] (ECF Doc. No. 1)

[2] (*Id.*)

[3] *See Roberts Tech. Grp. v. Curwood, Inc.*, No. 14-5677, 2015 WL 5584498 (E.D. Pa. Sept. 23, 2015); (ECF Doc. No. 84).

[4] RTG entitled Count V "Willful Breach of Covenant of Good Faith and Fair Dealing." We granted summary judgment as it is subsumed in the breach of contract claim. We granted RTG the ability to pursue this claim at trial through its breach of contract claim.

[5] (Trial Tr., Day 2, at 183-99.)

[6] (*Id.*; ECF Doc. No. 120)

[7] (ECF Doc. No. 123)

[8] (*Id.*)

[9] (ECF Doc. No. 127-2)

[10] (*Id.*)

[11] (*Id.*)

[12] (*Id.*)

---

[13] Fed.R.Civ.P. 50(a)(1).

[14] *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009).

[15] *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

[16] *Acumed LLC*, 561 F.3d at 211 (citing *Lightning Lube, Inc.*, 4 F.3d at 1166).

[17] *Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 691-92 (3d Cir. 1993).

[18] *Chainey v. Street*, 523 F.3d 200, 218 (3d Cir. 2008) (quoting *Williams v. Runyon*, 130 F.3d 568, 571-72 (3d Cir. 1997)).

[19] (ECF Doc. No. 130-2, at 9.)

[20] (ECF Doc. No. 131, at 10.)

[21] *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1257 (Pa. Super. Ct. 1983) (citation omitted).

[22] *Id.* at 1257-58.

[23] *Id.* at 1258.

[24] *Power Restoration Int'l Inc. v. PepsiCo, Inc.*, No. 12-1922, 2015 WL 1208128, *4 (E.D. Pa. Mar. 17, 2015) (citing *Delahanty*, 464 A.2d at 1258).

[25] *See Deaktor v. Fox Grocery Co.*, 475 F.2d 1112, 1116 (3d Cir.), *cert. denied*, 414 U.S. 867 (1973); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 735 (3d Cir. 1991); *Levy v. Schmidt*, 573 F.App'x 98, 102 (3d Cir. 2014); *Power Restoration*, 2015 WL 1208128, at *4.

[26] *Tunis Bros*, 952 F.2d at 735-36 (internal quotations omitted); *see also Levy*, 573 F. App'x at 102 ("The factors constituting net profits are (1) gross income, and (2) costs and expenses.").

[27] *Id.* at 736.

[28] *Power Restoration*, 2015 WL 1208128, at *4 (citing *Delahanty*, 464 A.2d at 1258).

[29] *ATACS Corp. v. Trans World Commc'ns Inc.*, 155 F.3d 659, 668 (3d Cir. 1998).

[30] *Levy*, 573 Fed. App'x at 102.

[31] *Power Restoration*, 2015 WL 1208128, at *4 (quoting *Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*, 833 F.2d 491, 495 (3d Cir. 1987)).

[32] (Trial Tr., Day 2, at 52-53, 61-62, 73, 86.)

14

---

[33] (*Id.* at 52-53.)

[34] (*Id.* at 61-62.)

[35] (*Id.* at 73.)

[36] (*Id.* at 73.)

[37] (*Id.*)

[38] (ECF Doc. No. 130-2, at 10.)

[39] No. 99-2687, 2000 WL 375259, *11 n.62 (E.D. Pa. Apr. 11, 2000).

[40] *Id.* at *11.

[41] *Id.* at *11 n.62.

[42] *Id.*

[43] While Curwood challenged Mr. Maloney on several grounds before trial, it never challenged his damages calculations based on gross rather than net profits.

[44] (Trial Tr., Day 2, 130-32.)

[45] (*Id.* at 130.)

[46] (*Id.* at 130-31.)

[47] (*Id.*)

[48] (*Id.* at 130.)

[49] (*Id.* at 130-32.)

[50] (*Id.* at 131.)

[51] (*Id.* at 132)

[52] *Tunis Bros*, 952 F.2d at 735-36.

[53] (Trial Tr., Day 2, at 144.)

[54] (*Id.* at 145-46.)

[55] (*Id.* at 145-47 ("I didn't need to account for that.") ("I don't have them in my report because they weren't necessary.") (Again, I don't have it in my report because it wasn't necessary . . . .").)

[56] (*Id.* at 146.)

[57] (ECF Doc. No. 130-2, at 14.)

[58] (*Id.*)

[59] (*Id.*)

[60] (Trial Tr., Day 2, at 142.)

[61] *See Deaktor*, 475 F.2d at 1116 ("Plaintiff's failure to produce evidence concerning the factors essential to establish net profits as opposed to gross profit, in effect, meant that the jury would have had to speculate as to the amount of damages.").

[62] 475 F.3d at 1114-15.

[63] *Id.* at 1116.

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] 952 F.2d at 735-38.

[69] *Id.* at 735.

[70] *Id.* at 735-36.

[71] *Id.* at 736.

[72] *Id.*

[73] *Id.*

[74] 573 F. App'x at 98, 101.

[75] *Id.* at 102.

[76] *Id.* at 102-03.

[77] *Id.* at 103.

[78] *Id.*

[79] 952 F.2d at 736.

[80] *Id.*

[81] (ECF Doc. No. 130-2, at 8.)

[82] (Trial Tr., Day 1, at 23-24).

[83] (ECF Doc. No. 130-2, at 14-15.)

[84] (*Id.*)

[85] RTG attempts to characterize Curwood's arguments as "eleventh hour" "sandbagging" because they failed to request a jury instruction on the issue and did not challenge Mr. Maloney on this issue. We do not encourage terms such as "sandbagging" and "moot-court trial tricks" as they only highlight weaknesses in the advocate's and his client's position. RTG is incorrect in arguing Curwood never requested a jury instruction on the net versus gross profits distinction as Curwood's counsel specifically requested this charge, for the first time, at the charging conference. (Trial Tr., Day 3, at 12-13.) This issue is not currently before us.

[86] *See Cone v. West Va. Pulp & Paper Co.*, 330 U.S. 212, 215 (1947) ("In short, the rule does not compel a trial judge to enter a judgment notwithstanding the verdict instead of ordering a new trial; it permits him to exercise a discretion to choose between the two alternatives.")

[87] Given our deference to the jury verdict, RTG's limited, but insufficient, proof of net profits, Curwood's belated assertion of the net profit challenges not raised before trial including in the *Daubert* briefing and need to ensure all parties have a meaningful opportunity to try the damages based on admissible evidence, we exercise our discretion to avoid undue prejudice by allowing the parties to supplement their damages discovery on the breach of contract, including expert disclosures, before the new trial on RTG's damages. *Total Containment, Inc. v. Dayco Products, Inc.*, 177 F.Supp.2d 332, 339 (E.D.Pa. 2001); *see generally, Habecker v. Clark Equip. Co.*, 36 F.3d 278, 288 (3d Cir. 1994).